# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chestnut Hill College,        :
            Petitioner     :
                              :
        v.                 :    No. 844 C.D. 2016
                              :    Argued: February 7, 2017
Pennsylvania Human Relations    :
Commission,                     :
            Respondent    :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE JULIA K. HEARTHWAY, Judge


**OPINION**
**BY JUDGE SIMPSON**            **FILED: April 7, 2017**


       This case involves an issue of first impression, whether a Catholic college's expulsion decision is reviewable by the Pennsylvania Human Relations Commission (Commission). A former African-American student, Allan-Michael Meads (Student) filed a complaint with the Commission, alleging Chestnut Hill College (College) expelled him based on racial discrimination in violation of the Pennsylvania Human Relations Act (Act)[1] and the Pennsylvania Fair Educational Opportunities Act (PFEOA).[2] This Court granted College permission to appeal from the Commission's interlocutory order that denied a motion to dismiss premised on a lack of jurisdiction. College argues the Commission lacks jurisdiction because it is not a public accommodation; rather, it is distinctly private

---

[1] Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §§951-963.

[2] Act of July 17, 1961, P.L. 776, as amended, 24 P.S. §§5001-5010.

based on its religious nature. College also contends the religion clauses of the First Amendment[3] preclude the Commission from reviewing its expulsion decisions.

Upon review, we affirm the denial of the motion to dismiss. Further, we conclude College did not identify any religious doctrine so as to trigger entanglement. Accordingly, we remand the matter to the Commission.

## I. Background

College was founded by the Sisters of Saint Joseph in 1924 as an independent, non-profit educational institution affiliated with the Catholic church. College is staffed by lay faculty and the Sisters of St. Joseph. At least one-fifth, plus one, of its Board of Directors is composed of members of the Sisters of St. Joseph. The congregational president of the Sisters of Saint Joseph serves as vice-chair of the Board. Although College acquaints all students with Catholicism and holds Catholic services that are open to all students, students are not required to attend religious classes or services.

During his senior year at College, Student collaborated with the African-American Awareness Society and directed the first African-American play at the College. He directed four plays over three days during Black History Month in 2012. The College hosted rehearsals and funded some play expenses. Student advertised that proceeds would benefit the Lupus Foundation of America (Foundation). Of the proceeds, Student donated $500 to the Foundation, and he expended $800 for a cast party. The total amount of the proceeds was unknown.

---

[3] U.S. CONST. amend. I.

2

In March 2012, College administrator Krista Murphy investigated Student's use of the proceeds, alleging he improperly retained them. Student provided receipts and his bank statement. Nonetheless, College charged Student with theft and forgery. The College held a hearing on the charges, in which Student fully participated.

The hearing officer recommended Student's expulsion for misappropriation of funds. Student appealed the recommendation to the College Appeals Board (Board).

In the interim, Student offered to pay restitution to the College in any amount it believed he owed. College rejected his offer.

In April 2012, the Board unanimously supported expulsion. College found Student liable for theft and forgery and ruled to permanently expel him. College ordered Student to pay $2,248. After he paid the funds, College donated the funds to the Foundation.

College expelled Student a few weeks before his scheduled graduation. As a result of his expulsion, Student was unable to graduate, he lost his employment as a resident assistant, he lost his internship and he was evicted from his housing in Fitzsimmons Hall.

Subsequently, Student filed a complaint with the Commission against the College, alleging his expulsion was based on his race in violation of the Act.

The Commission investigated whether Student's expulsion was a pretext for discrimination. In the course of its investigation, it reviewed the College's disciplinary records from 2007 through 2012. The Commission determined that African-American students were punished disproportionately higher than other College students.

The College's Sanctions policy provides:

> The following factors will be considered in determining sanctions: present attitude, past record, both positive and negative, the severity of the damage, injury harm or disruption or the potential for such, the student's or group's honesty, cooperation and willingness to make amends.

Reproduced Record (R.R.) at 332a. Student had no prior disciplinary actions.

In December 2015, the Commission found probable cause to credit the racial discrimination claims in Student's complaint. College filed an answer and new matter to the amended complaint, which added violations of the PFEOA. Four years later, in March 2016, after Student filed his complaint, College challenged the Commission's jurisdiction (Motion).

In the Motion, College argued the Commission lacked jurisdiction because it was not a "public accommodation" under the Act. College also asserted any adjudication would require decisions regarding the application of the First Amendment, which exceeded the Commission's subject matter jurisdiction. College claims that by assuming jurisdiction, the Commission jeopardizes its First Amendment rights.

4

The Commission issued an interlocutory order denying the Motion pursuant to 16 Pa. Code §42.131(c)(1) without granting a stay (Interlocutory Order). In accordance with 42 Pa. C.S. §702(b), it provided "this Interlocutory Order involves both constitutional issues and a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance termination of the matter." R.R. at 346a. College filed a petition for permission to appeal the Interlocutory Order pursuant to Pa. R.A.P. 1311.[4]

By order dated July 26, 2016, this Court permitted appeal from the Interlocutory Order. Specifically, this Court granted a petition for permission to appeal limited to three questions:

> 1) Whether Catholic colleges and universities are 'public accommodations' under the Act;
>
> 2) Whether the First Amendment of the U.S. Constitution precludes application of the Act to discipline and expulsion decisions of Catholic colleges and universities;
>
> 3) Whether the PFEOA is unconstitutional as applied to the disciplinary and expulsion decisions of College as a Catholic college.

Id. We also stayed the matter before the Commission pending resolution of this appeal. Student intervened. The Commission and Student sought reconsideration of our July 26th Order, which we denied.

---

[4] Initially, College also filed a petition for review of the Interlocutory Order, separately docketed. We granted Student's motion to quash the petition for review, dismissing it.

The Philadelphia Commission on Human Relations filed a friend-of-the-court brief supporting the Commission. After briefing, the matter is now ready for disposition.

## II. Discussion

College argues it is not a public accommodation under the Act; rather, it is distinctly private as a Catholic institution. Consequently, it is not subject to jurisdiction of the Commission. Further, College asserts that because Student's claims implicate religious entanglement under the First Amendment, the Commission lacks subject matter jurisdiction. In addition, College contends Student's claims under PFEOA are time-barred.

The Commission counters that College did not properly appeal to this Court, and it challenges our jurisdiction to address a non-final order. The Commission emphasizes that the Act and the PFEOA are both neutral anti-discrimination laws. Also, the Commission asserts the First Amendment is not a jurisdictional bar; rather, it offers an affirmative defense. Since College did not timely raise it, the Commission contends the defense is waived.

Student asserts College is a public accommodation because it is open to the general public. Further, he argues the Act and PFEOA do not violate the First Amendment. He contends the resolution of this case does not involve issues of Catholic doctrine so as to lead to entanglement between church and state. Student also argues the First Amendment does not bar decisions on racial discrimination claims because elimination of racial discrimination is of paramount concern.

## A. Jurisdiction

### 1. Appellate Jurisdiction

At the outset, we address the Commission's challenge to our jurisdiction to review the Interlocutory Order. The Commission claims our review is limited to only final orders under Pa. R.A.P. 341. In so doing, the Commission ignores the procedural posture of this appeal, whereby this Court undertook review of the Interlocutory Order by permission pursuant to Pa. R.A.P. 1311.

Then, the Commission claims that College did not satisfy the criteria of Rule 1311(b) because it did not seek an amendment of the Interlocutory Order. This argument presumes such an amendment was necessary. An interlocutory order may be appealed by permission provided it contains the statement required by 42 Pa. C.S. §702(b). Section 702(b) of the Judicial Code provides:

> When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that <u>such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter</u>, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

42 Pa. C.S. §702(b) (emphasis added). Rule 1311(b) does not require a party to apply for amendment of an order unless such a statement is missing.

Here, the Interlocutory Order contained the requisite statement. R.R. at 346a. Thus, we may assume jurisdiction over College's appeal.

7

## 2. Commission Jurisdiction

Our Supreme Court holds that a question of the Commission's jurisdiction "is to be resolved initially by the Commission during an investigation authorized under the Act." Pa. Human Relations Comm'n v. Lansdowne Swim Club, 526 A.2d 758, 759 (Pa. 1987); Pa. Human Relations Comm'n v. Feeser, 364 A.2d 1324, 1326 (Pa. 1976) (the Commission has "jurisdiction initially to receive, investigate, conciliate, hear and decide complaints alleging unlawful discrimination."). This Court holds "[i]n instances where it is unclear whether a particular agency possesses the jurisdiction to consider a claim before it, the courts of the Commonwealth have repeatedly refrained from interfering with the due course of administrative action, allowing the agency to determine the extent of its jurisdiction in the first instance." Pittsburgh Bd. of Pub. Educ. v. Pa. Human Relations Comm'n, 820 A.2d 838, 841-42 (Pa. Cmwlth. 2003).

College challenges the Commission's jurisdiction on two grounds. First, College contends it is not a public accommodation as defined by the Act because religious schools are distinctly private. Next, it asserts the Commission lacks subject matter jurisdiction because resolution of Student's complaint would result in religious entanglement in violation of the First Amendment.

### a. Public Accommodation

PHRA Section 4(*l*) of the Act defines "public accommodation" as:

> … any accommodation, resort or amusement which is open to, accepts or solicits the patronage of the general public, including but not limited to inns, taverns, roadhouses, hotels, motels … restaurants or eating houses, or any place where food is sold for consumption on the premises ... public

8

libraries, kindergartens, primary and secondary schools, high schools, academies, <u>colleges and universities</u>, extension courses <u>and all educational institutions under the supervision of this Commonwealth</u>, nonsectarian cemeteries, garages and all public conveyances operated on land or water or in the air as well as the stations, terminals and airports thereof, financial institutions and all Commonwealth facilities, and services, including such facilities and services of all political subdivisions thereof, <u>but shall not include any accommodations which are in their nature distinctly private</u>.

43 P.S. §954(*l*) (emphasis added). Also, Section 12 of the Act requires that "[t]he provisions of this act shall be construed liberally for the accomplishment of the purposes thereof ...." 43 P.S. §962. "Thus, the Act's ... enumeration of those places described as [public accommodations] should not be considered exhaustive." <u>Blizzard v. Floyd</u>, 613 A.2d 619, 620-21 (Pa. Cmwlth. 1992).

Provided the College "accepts ... the patronage of the general public," and is not in its nature "distinctly private," it constitutes a public accommodation as defined by the Act. <u>Lansdowne Swim Club</u>, 526 A.2d at 761. The Commission is "[t]he appropriate body" to apply the concepts of public and private to assess the nature of the accommodation before it. <u>Id.</u>

College maintains it is a "distinctly private" institution based on its Catholic affiliation as a matter of law. College's claim is predicated on the applicability of our decision in <u>Roman Catholic Archdiocese v. Pennsylvania Human Relations Commission</u>, 548 A.2d 328 (Pa. Cmwlth. 1988).

In <u>Roman Catholic</u>, a number of Catholic parochial high schools operated by the Archdiocese of Philadelphia appealed a series of Commission

9

interlocutory orders that declined to dismiss racial discrimination complaints filed against them. The complaints alleged the high schools exacted harsh discipline based on race when the schools did not invoke the same sanctions against white students. The parochial high schools challenged the Commission's denial of their motions to dismiss, arguing they were not public accommodations under the Act.[5] To the contrary, they argued parochial schools were distinctly private.

Following Lemon v. Kurtzman, 403 U.S. 602 (1971), this Court was persuaded that parochial high schools were an integral part of the Catholic mission, as "a powerful vehicle for transmitting the Catholic faith to the next generation." Roman Catholic, 548 A.2d at 330. In so doing, we emphasized the religious character of the parochial high schools based on several factors. We noted non-Catholic students were required to take religion classes and to attend Catholic services as a condition of attending school. We reasoned "parochial schools constituted an integral part of the religious mission of the Catholic church … [and] [t]his process of inculcating religious doctrine, is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly." Id. (quoting Lemon, 403 U.S. at 616) (emphasis supplied). Ultimately, we held Catholic parochial high schools were not public accommodations.

College asserts Catholic colleges are entitled to the same treatment as distinctly private institutions beyond the Commission's jurisdiction. We respectfully disagree.

---

[5] Public schools are places of public accommodation subject to the Commission's jurisdiction to protect students from racial discrimination. Pa. Human Relations Comm'n v. Chester Sch. Dist., 233 A.2d 290 (Pa. 1967).

First, as a matter of statutory interpretation, College is a "college or university" expressly enumerated as a "public accommodation" in 43 P.S. §954(*l*). That is in stark contrast to "parochial schools" that were not listed among the 50 plus entities encompassed within the definition. We underscored this point in Roman Catholic when we noted its absence as grounds for its exclusion under "the legal maxim '*expressio unius est exclusio alterius*.'" Roman Catholic, 548 A.2d at 329-30 (italics added). College did not address this statutory construction argument, and when asked during oral argument, offered no reason for differentiating itself from other colleges subject to the Act.

Second, College relies exclusively on our holding in Roman Catholic that the parochial high schools at issue were exempt from the Commission's jurisdiction. Without regard to their distinguishing characteristics, College posits that Catholic colleges and universities are entitled to share the same categorical exclusion from "public accommodations." However, this Court has never held Catholic colleges or universities are equivalent to parochial primary and secondary schools in terms of indoctrination of religion. While both parochial schools and Catholic colleges are educational institutions, College cites no precedent, federal or state, applying the U.S. Supreme Court decision Lemon to Catholic colleges so as to categorically exclude them from jurisdiction of an agency administering anti-discrimination laws.[6]

---

[6] Moreover, while there is no record, the submissions reflect several material differences between the parochial primary and secondary schools and College. First, the parochial schools in Roman Catholic Archdiocese v. Pennsylvania Human Relations Commission, 548 A.2d 328 (Pa. Cmwlth. 1988), educated children, not students who typically reached the age of majority. Second, the parochial schools were governed and operated by the Roman Catholic Archdiocese of Philadelphia. College is governed by one-fifth, plus one, comprised of the Sisters of St. Joseph. **(Footnote continued on next page…)**

Significantly, our decision in <u>Roman Catholic</u> relied heavily on the U.S. Supreme Court's characterization of Catholic parochial schools in <u>Lemon</u>. Similar to the circumstances here, in <u>Roman Catholic</u> we did not have the benefit of a factual record. Based on the Supreme Court's holding in <u>Lemon</u> that, "parochial schools involve substantial religious activity and purpose," we held the parochial high schools at issue were distinctly private institutions. <u>Id.</u> at 616.

However, College cites no authority to support its contention that Catholic colleges and universities are equivalent to parochial primary and secondary schools in their private nature. Indeed, the U.S. Supreme Court recognized fundamental differences between the type of education provided at parochial primary and secondary schools and Catholic colleges at the post-secondary level in <u>Tilton v. Richardson</u>, 403 U.S. 672 (1971) (plurality opinion).[7]

Specifically, in <u>Tilton</u>, the Court concluded: "There are generally significant differences between the religious aspects of church-related institutions of higher education and parochial elementary and secondary schools." <u>Id.</u> at 685. It reasoned,

---

**(continued…)**

Third, Catholic instruction was a required part of the curriculum at the parochial schools, and attending Catholic classes and Masses was a condition of attending the schools. College, by contrast, does not require attendance at religious services, and religious instruction is available, not required.

[7] In <u>Tilton</u>, the appellants challenged the Higher Education Facilities Act of 1963, 20 U.S.C. §§711-721, 751(a), arguing grants thereunder aided religious purposes of church-related colleges and universities. However, the Supreme Court rejected appellants' position that the religious and secular educational functions are inseparable at the higher education level.

12

[t]he 'affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age.' There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view, and Congress may well have entertained it. The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students.

Id. at 685-86 (emphasis added) (citations and footnotes omitted).

The Tilton Court explained "religious indoctrination is not a substantial purpose or activity" of church-related colleges. Id. at 687. For that reason, there was less risk that government funding of such institutions would support religious activities, and there would be less risk of entanglement between government and religion. As to the student body, the Court explained students of colleges are more free-thinking, and are more diverse and widely dispersed than the younger students of locality-based parochial schools.

That the Supreme Court issued its decision in Tilton on the same day it issued Lemon undermines College's contention that all religious schools, regardless of education level or student age, are entitled to the same exemption from regulation. The Court also recognizes colleges, as opposed to parochial schools, perform "essentially secular educational functions," thus reducing their religious character.

13

<u>Roemer v. Bd. of Pub. Works of Md.</u>, 426 U.S. 736 (1976). Notably, College did not acknowledge that federal jurisprudence recognizes several distinctions between parochial schools and church-related colleges. <u>See</u> <u>Universidad Cent. de Bayamon v. Nat'l Labor Relations Bd. (NLRB)</u>, 793 F.2d 383 (1st Cir. 1985) (colleges are not categorically exempt from NLRB jurisdiction like parochial schools).

In short, because <u>Roman Catholic</u> pertained only to parochial high schools, which are different from church-related colleges, we decline to extend our decision to exempt all Catholic colleges from Commission jurisdiction as a matter of law.

Therefore, at this stage, when the factual record remains undeveloped, we hold College is not absolutely excluded from the definition of "public accommodation" based on its religious nature. However, we do not foreclose the possibility that College may demonstrate its distinctly private nature during the proceedings before the Commission, based on a factual, as opposed to a purely legal, determination.

**b. First Amendment**

Next, we consider College's challenge to the Commission's subject matter jurisdiction. College contends resolution of Student's racial discrimination claims would result in unconstitutional entanglement between church and state. College asserts the deference rule under the religion clauses of the First Amendment deprives the Commission of jurisdiction over its expulsion decisions.

14

The Commission counters that this case does not involve matters of Catholic doctrine. Student's racial discrimination claim may be resolved without delving into ecclesiastical matters or excessive entanglement. Further, the Commission contends the First Amendment does not act as a jurisdictional bar. Therefore, College waived this defense when it did not raise it in the pleadings.

The religion clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Free Exercise Clause protects not only the individual's "right to believe and profess whatever religious doctrine one desires," Emp't Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 877 (1990), but also a religious institution's right to decide matters of faith, doctrine, and church governance. Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952); Petruska v. Gannon Univ., 462 F.3d 294 (3d Cir. 2006). The Establishment Clause mandates neutrality and prohibits all forms of government action establishing religion, including decisions by civil tribunals. Se. Pa. Synod of the Evangelical Lutheran Church in Am. v. Meena, 19 A.3d 1191 (Pa. Cmwlth. 2011).

That a dispute implicates First Amendment concerns does not foreclose a tribunal from exercising jurisdiction. Connor v. Archdiocese of Phila., 975 A.2d 1084 (Pa. 2009). The nature of the dispute, as to whether it involves matters of religious doctrine, or may be resolved using neutral principles, determines whether subject matter jurisdiction lies. Id.

## (1) Deference Rule

First Amendment jurisprudence reinforces that generally courts must defer to church hierarchy in the resolution of any ecclesiastical matter so as to avoid entanglement between church and state. Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976). This is commonly referred to as the "deference rule." Id. at 709 ("where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity"). Under the deference rule, civil courts cannot adjudicate disputes regarding ecclesiastical matters, encompassing church policy and administration or religious doctrine. Id.

The U.S. Supreme Court refined the deference rule in later decisions, holding there are neutral principles of law that apply to civil disputes involving religious institutions that are "flexible enough to accommodate all forms of religious organization and polity." Jones v. Wolf, 443 U.S. 595, 604 (1979). The neutral principles approach limits the courts "to determine the underlying issue by utilizing purely legal principles without delving into ecclesiastical matters." Peters Creek United Presbyterian Church v. Wash. Presbytery of Pa., 90 A.3d 95, 104-05 (Pa. Cmwlth. 2014) (en banc) (citation omitted). The approach distinguishes between religious beliefs, which are ecclesiastical matters beyond a court's purview, and conduct premised upon those beliefs, which conduct "remains subject to regulation." Connor, 975 A.2d at 1106 (citing Cantwell v. Conn., 310 U.S. 296, 303-04 n.18 (1940)). Although states may adopt a means of determining matters

involving religious institutions on the continuum of deference to neutral principles, under no circumstances may a court inquire into doctrinal issues. Jones.

Pennsylvania courts recognize the deference rule as it applies to ecclesiastical matters, Presbytery of Beaver-Butler of United Presbyterian Church v. Middlesex Presbyterian Church, 489 A.2d 1317 (Pa. 1985), and the refinement of the rule under the neutral principles of law approach, Connor.

College argues the Commission lacks subject matter jurisdiction based solely on our sister court's decision in Gaston v. Diocese of Allentown, 712 A.2d 757 (Pa. Super. 1998). In Gaston, parents sued a parochial elementary school for varied tort claims stemming from student expulsions. The trial court held it lacked subject matter jurisdiction to consider the claims under the deference rule. The Superior Court affirmed.

After analyzing the decisions of Catholic institutions that involved doctrinal versus civil areas of law, the Gaston Court reasoned the connection between parochial schools and Catholic dogma was inseparable so as to require deference to the school's expulsion decision. Specifically, it reasoned:

> The parochial school, synonymous with the installation of dogma and discipline in its students, is an integral part of the Roman Catholic Church. The school is a repository for Catholic tradition and scripture; it is so intertwined with the church doctrine that separation is neither pragmatic nor possible. Intrusion into the bishop's decision on matters concerning parochial school discipline and expulsion places this court perilously close to trespassing on sacred ground.

Id. at 761. The Superior Court held a parochial elementary school's expulsion decision sounded in religious faith, such that review of the expulsion allowed a court to question doctrinal law.

Significantly, the Gaston Court's rationale for holding the civil courts lack jurisdiction over an expulsion decision was limited to parochial schools. College cites no authority for extending Gaston to Catholic colleges. As such, there is no authority supporting its conclusion that an expulsion decision of a Catholic college is a purely ecclesiastical matter that requires application of the deference rule.

Further, College disregards more recent precedent in Connor that narrowed the deference rule's application to a parochial school's expulsion decision. Significantly, in Connor our Supreme Court discarded the broad deference rule applied in Gaston in favor of the neutral principles of law approach.

Unlike the Superior Court in Gaston, in Connor our Supreme Court held that courts may exercise subject matter jurisdiction over a tort suit arising out of a parochial school's expulsion decision. In its analysis, the Court considered whether the alleged misconduct that was the basis for expulsion was grounded in Church doctrine, or was capable of review under neutral principles of law.

The Connor Court established a three-prong approach to enable a fact-finder to determine whether the deference rule applies:
  (1) examine the elements of each of the plaintiff's claims;

  (2) identify any defenses forwarded by the defendant; and[,]

18

(3) determine whether it is reasonably likely that at trial, the fact-finder would ultimately be able to consider whether the parties carried their respective burdens as to every element of each of the plaintiff's claims without intruding into the sacred precincts [of ecclesiastical matters].

Id. at 1103. The Court determined the matter was capable of resolution without deference because the conduct underlying the expulsion, i.e., whether the student brought a pen-knife to school, did not require review or construction of religious doctrine.

Under Connor, the fact-finder analyzes whether a dispute is ecclesiastical or civil in nature. Id. Thus, as fact-finder, the Commission has the authority to determine whether the deference rule applies. Id.; see Petruska (tribunal's power to hear claim differs from whether the First Amendment bars claim).

Relevant here, the Court reasoned the claim was susceptible to neutral principles of law, and the First Amendment did not act as a jurisdictional bar, because the courts did not need to construe religious doctrine to assess the claims. Id. Applying the analysis of Connor here, we discern no basis for the First Amendment to bar the Commission's review of Student's discrimination claims.

More particularly, as to the first prong, Student's claims do not require the Commission to construe religious doctrine. Importantly, College did not identify any Catholic doctrine as grounds for Student's expulsion. Rather, College stated "[Student's] expulsion was the result of [his] own willful, deceitful

19

and dishonest behavior which included the misappropriation of funds for his own personal use and benefit." Supplemental Certified Record (S.C.R.), Item No. 2, Answer at ¶23. Willful, deceitful and dishonest behavior is routinely addressed through civil tort law and through criminal law, without resort to religious doctrine. As a result, the necessity for construing ecclesiastical matters is not evident.

As to the second prong, College did not cite any religious doctrine-based defense to Student's racial discrimination claims. College does not contend the alleged discriminatory practice (racially motivated expulsion), is required by its religious doctrine. Cf. Maguire v. Marquette Univ., 814 F.2d 1213 (7th Cir. 1987) (deference rule may preclude review of refusal to hire teacher who held beliefs on abortion contrary to Christian doctrine).

As to the third prong, despite repeated inquiries as to how doctrine bears on the resolution of Student's claims, College offered no explanation during oral argument. Indeed, College draws our attention to no doctrinal questions that would undermine the application of neutral principles to Student's discrimination claims. Therefore, we discern no merit in College's contention that the Commission's consideration of the dispute is barred by the deference rule.

Moreover, our holding that the First Amendment does not preclude the Commission's jurisdiction is consistent with federal jurisprudence. See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619 (1986); see also Equal Emp't Opportunity Comm'n v. Miss. Coll., 626 F.2d 477, 488 (5th Cir.

20

1980) ("Because no religious tenets advocated by the College … involve discrimination on the basis of race or sex, an investigation by the EEOC will only minimally intrude upon any of the College's … religious beliefs.  No ongoing interference with the College's religious practices will result from an EEOC investigation of the charge .…").

In Ohio Civil Rights Commission, the U.S. Supreme Court reasoned that a human relations commission has jurisdiction to hear discrimination claims even where First Amendment religious claims are raised because: "the [c]ommission violates no constitutional rights by merely investigating the circumstances of [a discriminatory act], if only to ascertain whether the ascribed religious-based reason was in fact the reason for the [discriminatory act]." Id. at 628.

Ohio Civil Rights Commission involved a claim of sex discrimination. The case arose from the firing of a female teacher who attempted to return to work after she gave birth, when Catholic doctrine required her to stay home until her child reached pre-school age.  The parties raised discrimination claims in the district court, which were also the subject of a complaint filed with Ohio's administrative counterpart to the Commission.  The U.S. Supreme Court held that the district court should have abstained and allowed the administrative process to proceed.

In sum, College here did not connect Student's claims to any religious doctrine so as to entangle the Commission in purely ecclesiastical matters. Moreover, there is no allegation that the alleged discriminatory act, expelling

21

Student for misappropriating funds, required any consideration of Catholic doctrine. The College does not allege racial discrimination is part of its ecclesiastical beliefs. Mississippi Coll. Further, to the extent Gaston held a parochial elementary school's expulsion decision involved a matter of purely ecclesiastical concern, our Supreme Court's decision in Connor superseded it. As a result, College does not support its foundational assumption that expulsion involves an ecclesiastical matter.

The First Amendment acts as a *jurisdictional* bar only if a controversy interferes with the relationship between a church and one of its ministers,[8] or if the dispute involves a matter of purely ecclesiastical concern. As the party moving for dismissal, College must show that Student's claims involve ecclesiastical matters so as to require deference, "we will not make [College's] arguments for them." Connor, 975 A.2d at 1103. College made no such showing. Applying Connor to the current record, the deference rule does not bar the Commission's jurisdiction.

### (2) Entanglement

Courts find an unconstitutional entanglement with religion in situations where a "protracted legal process pit[s] church and state as adversaries," and where the government is placed in a position of choosing among "competing religious visions." Equal Emp't Oppty. Comm'n v. Catholic Univ. of Am., 83 F.3d 455, 465 (D.C. Cir. 1996) (citations omitted). Entanglement must be

---

[8] Under the "ministerial exception," the First Amendment protects a church's right to hire, fire, promote, and assign duties to its ministers" and teachers of theology. Mundie v. Christ United Church of Christ, 987 A.2d 794, 798 (Pa. Super. 2009).

"excessive" before it runs afoul of the Establishment Clause.[9] <u>Mobley v. Coleman</u>, 110 A.3d 216, 220 (Pa. Cmwlth. 2015). To determine whether the government entanglement with religion is excessive, "we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." <u>Lemon</u>, 403 U.S. at 615.

There is no dispute that the Act is a neutral law that may be applied by consulting objective, non-ecclesiastical principles. College, as the moving party, bore the burden of proving the Act violated its First Amendment rights. <u>St. Elizabeth's Child Care Ctr. v. Dep't of Pub. Welfare</u>, 989 A.2d 52 (Pa. Cmwlth. 2010). On the current record, College failed to identify any actual or imminent infringement on its rights. <u>Id.</u>

In <u>St. Elizabeth's Child Care Center</u>, a day care center argued the enforcement of an agency's regulatory scheme infringed on its right to free exercise. Specifically, the center contended the agency's licensing and oversight would significantly burden its religious mission. However, this Court rejected the center's First Amendment arguments because the center did not identify the impact of any regulation, and "[did] not explain how the [agency action] interfere[d] with [its] ability to communicate Church teachings." <u>Id.</u> at 56.

---

[9] In analyzing an Establishment Clause claim, we consider: (1) whether the government action serves a secular purpose; (2) that its principal or primary effect neither advances nor inhibits religion; and, (3) that it does not foster an excessive government entanglement with religion. <u>In re Redev. Auth. of City of Phila.</u>, 938 A.2d 341 (Pa. 2007).

23

We held that as a threshold matter, a religious institution must make a showing that the application of the challenged law substantially burdens its First Amendment rights. Id. Speculative claims that an agency's application of its own standards, which may be at odds with religious doctrine, substantially burden the institution's free exercise do not suffice to show constitutional infringement.

Here, College offers mere speculation that adjudication of Student's racial discrimination claim will result in unconstitutional entanglement. College does not explain how Student's expulsion implicates Catholic doctrine or how review of expulsion decisions requires review of ecclesiastical matters. Instead, College assumes the expulsion from a Catholic school was a purely ecclesiastical matter under Gaston. Thus, College does not meet this threshold burden.[10] Id.

## B. PFEOA - Unconstitutional "As Applied"

Lastly, we consider whether the PFEOA is unconstitutional as applied to the disciplinary and expulsion decisions of College as a Catholic institution.

The purpose of the PFEOA is to afford students equal opportunities in education, "regardless of their race, religion, color, ancestry, national origin, sex, handicap or disability." Section 2 of the PFEOA, 24 P.S. §5002. Section 4(a) of the PFEOA provides "... it shall be an unfair educational practice for an educational

---

[10] Student also argues elimination of racial discrimination is an area of paramount state concern that trumps any risk of entanglement. Because College did not show any risk of entanglement to support a First Amendment defense at this stage, we do not reach this argument and balance the interests.

institution ... [t]o expel, suspend, punish, deny facilities or otherwise discriminate against any student because of race ... [or] national origin ....” 24 P.S. §5004(a)(3).

PFEOA defines “educational institutions” to include “any post-secondary school, college or university incorporated or chartered under any general law or special act of the General Assembly, except any religious or denominational educational institutions as defined in this act.” Section 3 of the PFEOA, 24 P.S. §5003 (definitions) (emphasis added). It defines religious educational institutions as:

> an educational institution which is operated, supervised, controlled or sustained primarily by a religious or denominational organization, or is one which is stated by the parent church body to be and is, in fact, officially related to that church by being represented on the board of the institution, and by providing substantial financial assistance **and** which has certified, in writing, to the [C]ommission that it is a religious or denominational educational institution.

Id. (definitions) (emphasis added); see 16 Pa. Code §47.71. The Commission is vested with the authority to administer the PFEOA. Section 5 of the PFEOA, 24 P.S. §5005.

There is no dispute that College did not register as a religious educational institution with the Commission. Regardless, a religious educational institution is not exempt from race discrimination complaints. 16 Pa. Code §47.73.

Significantly, College did not address this issue in its brief. Nor did College explain how the PFEOA, a law that is neutral on its face, is

25

unconstitutional <u>as applied</u> to College to enable this Court to consider this argument. Accordingly, this issue is waived. Pa. R.A.P. 2119.

Nonetheless, College's constitutional challenge to the PFEOA should be addressed by the Commission in the first instance. An "as applied" challenge to the constitutionality of a statute administered by an agency is best addressed initially by that agency. <u>Lehman v. Pa. State Police</u>, 839 A.2d 265 (Pa. 2003). "[S]ubstantial policy reasons require exhaustion of administrative remedies where the constitutional claims challenge only the application of the statute." <u>Funk v. Dep't of Envtl. Prot.</u>, 71 A.3d 1097, 1102 (Pa. Cmwlth. 2013). As our Supreme Court reasoned:

> [i]t is both sensible and efficient to permit administrative agencies to address constitutional challenges to a statute's application. First, the agency is given an opportunity to interpret the statute it is charged with administering to avoid an unconstitutional application. Second, agencies currently decide challenges to the constitutionality of regulations; administrative competency is not an issue. Third, agencies are better situated than the courts to develop agency-specific issues, and to find facts. Fourth, refusing to consider constitutional challenges to a statute's application allows litigants to circumvent the exhaustion of administrative remedies doctrine before seeking judicial review.

<u>Lehman</u>, 839 A.2d at 276 (quotation omitted).

Moreover, as contrasted with a facial constitutional challenge, an as-applied challenge is concerned with the specific application of a statute based on the facts as found by the agency. In this procedural posture, on a motion to dismiss for lack of jurisdiction, the Commission has not reached the fact-finding stage.

26

Consequently, the record does not contain sufficient facts to determine whether the PFEOA is unconstitutional as applied.[11]

Nevertheless, College's allegations that applying the PFEOA would embroil the Commission in ecclesiastical matters are based on the assumption that all disciplinary decisions implicate Catholic doctrine. We cannot assume that the alleged entanglement will occur without a showing that the racial discrimination claim and related investigation requires interpretation of Catholic doctrine. College cites no religious decision or doctrine as the basis for this contention in its briefs, nor did it identify any ecclesiastical issue in which the Commission may become entangled when repeatedly asked during oral argument.

### III. Conclusion

For the foregoing reasons, College is not categorically excluded from the definition of "public accommodation" based on the similarity of Catholic colleges to parochial primary and secondary schools. We decline to extend Roman Catholic to exclude Catholic colleges from Commission jurisdiction over discrimination complaints.

Ultimately, College cites no authority to support its contention that expulsion decisions of a Catholic college are entitled to deference under the

---

[11] Generally, when evaluating a statute's constitutionality under the religion clauses of the First Amendment, the courts consider: whether the act reflects a secular legislative purpose; whether the primary effect of the act is to advance or inhibit religion; whether administration of the act fosters excessive entanglement with religion; and, whether implementation of the act inhibits the free exercise of religion. Lemon v. Kurtzman, 403 U.S. 602, 678 (1971).

27

deference rule. At this stage of the proceedings, applying <u>Connor</u>, Student's racial discrimination claims are susceptible to decision under neutral principles of law. The Commission is capable of making that determination as the fact-finder. Because College identified no ecclesiastical matter in which the Commission may become entangled, as it articulated no doctrinal basis for its alleged discrimination, the Commission may initially consider Student's claim without risk of entanglement.

Failing to articulate how the Act or PFEOA infringe its religious autonomy, College did not meet its threshold burden for a claim under the religion clauses of the First Amendment. Moreover, were this Court to construe the First Amendment as College requests, any church-related institution's decisions would be immune from suit based on unexplained references to church doctrine.

Regardless, whether PFEOA is unconstitutional "as applied" to College should be decided in the first instance by the Commission. Because College has not demonstrated a basis to deny the Commission initial jurisdiction, we affirm its denial of College's Motion. This matter is remanded to the Commission for further proceedings consistent with this opinion.

ROBERT SIMPSON, Judge

28

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Chestnut Hill College,                    :
              Petitioner     :
                                     :
          v.                               :  No. 844 C.D. 2016
                                     :
Pennsylvania Human Relations             :
Commission,                               :
              Respondent     :

## **O R D E R**

**AND NOW**, this 7th day of April, 2017, the order of the Pennsylvania Human Relations Commission is **AFFIRMED**, and the matter is remanded to the Commission for further proceedings.

 

                                     _____
                                     ROBERT SIMPSON, Judge