# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Neshaminy School District,      :
                Petitioner     :
                                 :
            v.              :    No. 1765 C.D. 2019
                                 :    Argued: December 8, 2020
Pennsylvania Human Relations     :
Commission,                    :
                Respondent    :

BEFORE:      **HONORABLE RENÉE COHN JUBELIRER,** Judge
                     **HONORABLE P. KEVIN BROBSON,** Judge[1]
                     **HONORABLE CHRISTINE FIZZANO CANNON,** Judge

**OPINION BY**
**JUDGE COHN JUBELIRER**                     **FILED: June 7, 2021**

Neshaminy School District (District) petitions for review of the Final Opinion and Order of the Pennsylvania Human Relations Commission (Commission) finding that the District had violated Section 5(i)(1) of the Pennsylvania Human Relations Act[2] (Act), 43 P.S. § 955(i)(1), through the District's use of Native American imagery and the term "Redskins" because such use is harmful to **non-Native American** students as they create impermissible stereotypes. The Commission found that the evidence of harassment of, or a loss of educational opportunities to,

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

[2] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(i)(1).

Native American students was either speculative or insufficient and thus did **not** support claims of discrimination. However, based on a liberal construction of Section 5(i)(1), it concluded that the harm to non-Native American students constituted unlawful discrimination under the Act. As relief, citing the opinion of Andre Billeaudeaux, the District's expert, that the goal is to "Educat[e] not Eradicat[e]," the Commission allowed the District to continue using the name Redskins, but required the District to provide education regarding the negative and positive attributes associated with the term. (Final Opinion (Op.) and Order at 51-52.) In addition, the Commission directed the District to "cease and desist from [] us[ing] [] any and all logos and imagery in the Neshaminy High School [(High School)] that negatively stereotypes Native Americans" based on Mr. Billeaudeaux's testimony that most of the currently used images and logos should be changed because they were not regionally appropriate and were historically misaligned. (*Id.* at 54, 57.) The District has petitioned this Court for review, asserting 14 reasons why the Commission erred or abused its discretion.

## I.    Background
### A. Relevant Statutory Provisions

At issue is whether the Commission's finding of this violation is consistent with the language of Section 5(i)(1) of the Act, which provides, in pertinent part:

It shall be an unlawful discriminatory practice . . .

For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any public accommodation, resort or amusement to:

(1) **Refuse, withhold from, or deny** to any person **because of his** race, color, sex, religious creed, **ancestry**, national origin or handicap or disability, . . . either directly or indirectly, any of the

2

accommodations, advantages, facilities or privileges of such public accommodation, resort or amusement.

43 P.S. § 955(i)(1) (emphasis added).  Under Section 9(a) of the Act,

> **[a]ny person** . . . **aggrieved** by **an unlawful discriminatory practice may** make, sign and **file** with the Commission **a verified complaint**, in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission. . . .  **The Commission upon its own initiative** . . . **may**, in like manner, make, sign and **file** such **complaint**. . . .

43 P.S. § 959(a) (emphasis added).  Here, the Complaint was filed by the Commission, but we will refer to it having been filed by the "PHRC" to delineate between the adjudicatory and prosecutorial arms of the Commission.  Finally, the legislature stated in Section 12(a) of the Act that the Act's provisions "shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply."  43 P.S. § 962(a).

### B. Factual Background

Based on the Commission's findings of fact, we set forth the following background.  The District has 11 schools, one of which is the High School, where approximately 2,500 to 3,000 students attend.  The District's enrollment process allows, but does not require, students to identify their race or ancestry.  Thus, the District's enrollment data does not accurately reflect how many students identify as Native American.  Since the 1930s, the High School has used the name Redskins for its sports teams, yearbook, and other purposes.  Until the 1980s, the High School had a live mascot, but it does not currently have such a mascot.  The High School uses and displays "[l]ogos and generic caricature images of Native Americans" in

3

and around the "High School and near its athletic playing fields." (Final Op. and Order, Finding of Fact (FOF) ¶ 11.)

In 2001, with the High School's Principal's approval, the student newspaper, the Playwickian,[3] published an editorial entitled "Reading, Writing and Racism," challenging the continued use of the term Redskins, which a majority of the editorial staff considered "to be a culturally insensitive antiquated racist slur." (*Id.* ¶¶ 47, 49-50.) The goal of the editorial was to obtain a change in the name, to make others aware that the name was offensive, and to propose banning the publication of the word in the Playwickian. No change to the name occurred as a result of the editorial.

In 2012, Donna Boyle, a District resident and mother of one former student and a current High School student, who is of Cherokee and Choctaw ancestry, complained that the term Redskins was a personally offensive racial slur. (*Id.* ¶¶ 53-54.) Among others, Ms. Boyle complained that: the image used was not that of a Native American from the region; the term, in her view, related to the "bloody history when whites were paid a bounty to exterminate Native Americans"; and other racial slurs, such as the "N" word, would not be allowed. (*Id.* ¶¶ 55-57.) No action was taken as a result of these complaints. Ms. Boyle complained to the High School's Principal, Dr. Robert McGee, who responded that "everyone in Neshaminy is a proud Redskin," to which she responded that her family was not proud of the term. (*Id.* ¶¶ 59-60.) Ms. Boyle continued to complain to Dr. McGee and sent psychological and educational research, reflecting how the use of the term Redskins had "long-term harmful effects on self-esteem and achievement of Native Americans and also has long-term negative effects on non-Native Americans as well." (*Id.* ¶ 61.) Ms. Boyle also complained at School Board meetings and sent hundreds of

___

[3] Although the Commission uses "Playwicken" as the name of the student newspaper, the record establishes that the correct name is "Playwickian."

4

emails to Dr. McGee and the School Board explaining the effect on her High School student son, Son, and requesting that action be taken. Again, the District took no action on Ms. Boyle's concerns. In 2014, Ms. Boyle invited Dr. McGee to a symposium at a local university where a Native American speaker was speaking about Native American rights and the use of the term Redskins. Dr. McGee attended the symposium, after which he made arrangements for Son to receive a yearbook without the word Redskins on it.

In October 2013, Dr. McGee approved two editorials for the Playwickian: one supporting a ban on the use of the term Redskins in the newspaper and one opposing the ban. The students had become aware of Ms. Boyle's concerns, and a majority of the editorial staff found the term offensive and, after taking a vote, decided to write the editorial that the term would no longer be used in the Playwickian. Many of those editors believed the use of the term violated School District's Policy 547, which describes the handling of discrimination and harassment, because the term was inherently offensive and racist. The counter position was written by another editor who did not find the term offensive. This editor would later change her mind after doing more research. The District placed the ban on hold, and Dr. McGee emailed the Playwickian's advisor, Tara Huber, that the hold would last until further consideration of the impact of the ban and whether the ban would infringe on other students' rights. At the time, the District's Policy 600 allowed for the redaction of slurs from school publications. On November 21, 2013, the student editors, along with their parents and Ms. Huber, attended a meeting with Dr. McGee and the High School's assistant principal. At the meeting, Dr. McGee gave the student editors materials explaining the District's conclusion that the student editors had no right to issue the ban. Per the testimony of one of the student editors, the students were given

5

15 minutes to present their positions, and the administrators took 1 hour and 45 minutes to present their position, which included concerns regarding the negative reactions other students and the community would have to the ban, particularly on social media. Several of the students felt they were talked at, bullied, intimidated, and harassed. The ban remained in place. Following the meeting, the student editors provided Dr. McGee with internet posts illustrating the types of negative reactions they were receiving, and a student's parents advised the District's Superintendent, Robert Copeland, that the student had been yelled at by a teacher in front of other students for being ungrateful and questioning how she could write articles criticizing the use of the term Redskins. Upon being informed of the complaint, Dr. McGee spoke to the teacher and instructed the teacher to apologize. Dr. McGee later made an announcement to the High School students to address the controversy, asking the students to debate the matter respectfully, which was aimed at addressing the criticism of the Playwickian's student editors. (Reproduced Record (R.R.) at 852a-54a, 1287a.) In November 2013, the Playwickian editors published an editorial critical of placing the ban on hold, which Dr. McGee had approved prior to publication. (*Id.* at 856a, 1506a.)

In 2014, the District began the process of revising Policy 600, including establishing a Policy Committee that held a number of public meetings attended by the students, who were allowed to express their opposition to the proposed revisions. The School Board revised Policy 600 in June 2014, which now states that

> the term "Redskins" when referring to the School District mascot and when used to express the writer's viewpoint about the term shall not be construed as a racial or ethnic slur and is not intended by the Board of the School Directors as a racial or ethnic slur. Consequently, no student or school official shall censor or prohibit use of the term or of an article or editorial that has been submitted that contains the word.

6

(FOF ¶ 101 (quoting District Ex. 68).) After reading the new Policy 600, the student editors concluded it precluded them from treating Redskins as they would treat other racial slurs. When a letter to the editor containing the term Redskins was submitted, the student editors attempted to redact the term believing it was offensive. Dr. McGee and the Superintendent directed the student editors to publish the letter in full, refusing to allow the redaction. The Playwickian did not run the letter but published an editor's note, without Dr. McGee's approval. Dr. McGee attempted to collect copies of the Playwickian containing the unapproved note. After this incident, other students became upset with the Playwickian's student editors and tore up newspapers in the High School's hallways.

In the spring of 2016, a student submitted an article for publication in the Playwickian about the "Mr. Redskin" pageant, which had been held since 2010. Two votes occurred on whether to include the full word in the article, one by all Playwickian students – who voted 14-13 to use the full word, and one by only the editorial board, which voted 8 to 1 to not use the word. Based on the second vote, the editors chose to publish a redacted version of the article online. The author's parents contacted Dr. McGee, who removed the redacted version from the website, republished the article without redaction, and directed that students only be allowed to upload articles to the website with Ms. Huber's supervision.

### C. Complaints of Discrimination

In September 2013, Ms. Boyle filed a complaint on behalf of Son with the Commission, alleging ancestry-based harassment of Son. Following an investigation, a finding of probable cause was issued. Ms. Boyle's complaint was scheduled for a public hearing in October 2015, but she voluntarily withdrew the complaint before the hearings began. In October 2015, within days of Ms. Boyle

7

voluntarily withdrawing her complaint, the PHRC filed a Complaint against the District. In December 2017, the PHRC filed a First Amended Complaint asserting two counts against the District for allegedly violating the Act: (1) by denying equal education opportunities because of race/ancestry, Native American, (a) to Native American students by creating a hostile racial environment harmful to Native American students, and (b) to non-Native American students by allowing non-Native American students to develop harmful inappropriate stereotypical attitudes and beliefs about Native Americans; and (2) through the harassment of Native American students based on their ancestry/race. The District responded, denying the allegations and challenging, among other things, the Commission's jurisdiction over the District and that the factual claims relied upon by the PHRC occurred outside the Act's statutory limitations period of 180 days. Public hearings before the Commission's permanent Hearing Examiner occurred over a number of days, at which the PHRC and the District presented testimonial and documentary evidence.

*D. Proceedings Before the Hearing Examiner*

Before offering evidence on the merits, the parties presented arguments on preliminary matters, including whether the Commission had jurisdiction over the District and to what extent, if at all, the testimony of the PHRC's expert, Ellen Staurowsky, Ph.D., could be considered based on the District's Motion in Limine. On the former issue, the Hearing Examiner explained the Commission would decide the issue. On the latter issue, the Hearing Examiner granted the Motion in Limine in part, precluding Dr. Staurowsky from making specific causation opinions as to harm caused to District students by the use of the term Redskins and related imagery and logos because she had not visited the District or interviewed anyone from the

District, but not precluding Dr. Staurowsky's testimony in its entirety. The restriction on Dr. Staurowsky's testimony was not challenged on appeal.

Dr. Staurowsky testified regarding the use of the term Redskins and related imagery in history and sports and the effect such use, particularly by educational institutions, has on Native Americans and non-Native Americans as follows. Dr. Staurowsky opined, based on her research, that Native American sports imagery has the capacity to create a racially hostile learning environment and promote insensitivity toward Native Americans, and the stereotyping of Native Americans fosters a prejudicial view that the stereotyping of minority groups in general is acceptable. (FOF ¶¶ 39-40.) One of the dictionary sources cited by Mr. Billeaudeaux actually indicated that the term Redskins is a racial pejorative and can be offensive, disparaging, and inappropriate. The term can be associated with a period in the nation's history when it referred to a monetary reward paid as a bounty for killing a Native American. It is similar to the "N" word and other racially offensive names that are considered to be racial slurs. Dr. Staurowsky explained there were over 100 academic reports reflecting that the use of Native American sports imagery threatens the health and well-being of Native American students. Further, she testified that resolutions by the National Congress of American Indians (NCAI), representing 260 tribes, called for cessation of stereotyping of Native Americans in sports imagery, and a statement by the United States (U.S.) Commission on Civil Rights in 2001 that "call[ed] for an end to the use of Native American images and team names by non-Native schools" because they are disrespectful and offensive, particularly when found in educational institutions. (*Id.* ¶¶ 43-44.) The U.S. Commission on Civil Rights' statement indicated that, in addition to harming Native American students, "[t]he stereotyping of any racial,

ethnic, religious or other groups when promoted by . . . public educational institutions, teach[es] all students that stereotyping of minority groups is acceptable," the "false portrayals [of Native Americans through imagery and team names] prevent non-Native Americans from understanding the true historical and cultural experiences of American Indians," and "encourage[s] biases and prejudices that have a negative effect on contemporary Indian people." (*Id.* ¶ 44.) Dr. Staurowsky also testified about other policies, including the NCAA's 2005 policy prohibiting member schools from participating in postseason competition if the schools maintained a nickname, logo, mascot, or moniker that was offensive to Native Americans if the school did not have permission of a local tribe. (*Id.* ¶ 45.)

The PHRC offered the testimony of witnesses who found the word Redskins offensive and to be a racial slur, including the editor-in-chief of the Playwickian in 2001; alumni who had changed their mind after performing independent research; a 2015 graduate who interacted with members of the local Lenni-Lenape tribe who had expressed that the term was offensive; and a 2016 graduate of Asian descent who also felt that he needed to represent voices not heard. (*Id.* ¶¶ 37a-37b, 37d-37g.) A 25-year teacher at the High School testified that she viewed the term as being derogatory, a racial pejorative, and a slur, and that the use of the word harms the students, making them anxious, embarrassed, and closed off from others. (*Id.* ¶ 37c.) Ms. Huber, an English teacher at the High School and the advisor for the Playwickian, testified that it is a racist term to her and that, after attending a conference attended by around 5,000 Native Americans from more than 500 different tribes, she believed some Native Americans found it offensive, while others viewed it as a term of honor. (*Id.* ¶ 37h.) A member of the Oglala Lakota Nation testified that he had pushed against the use of Native Americans as mascots since

his childhood and that the term is a racial slur that harms the mental health and stability of children because it dehumanizes and objectifies Native Americans. He stated the term is offensive, should not be used in society, and is akin to black face. (*Id.* ¶ 37i.)

Ms. Boyle testified about her experiences and feelings about the term being offensive and discriminatory. She also testified about the experiences of Son, who did not testify. The District objected to Ms. Boyle's testimony as to Son's experiences, as being hearsay. The Commission responded that Ms. Boyle's testimony was based on her observations of Son and fell within an exception to the hearsay rule. The Hearing Examiner allowed the testimony to the extent it was based on Ms. Boyle's observations. (R.R. at 816a.) Ms. Boyle testified that Son seemed anxious and his self-esteem was affected. It reached a point, Ms. Boyle stated, that Son entered into a special program where he would attend school in the morning and then go to work for the rest of the day.

Mr. Billeaudeaux, the District's expert, testified as follows. He is a representative of the Native American Guardian Association (NAGA), a non-profit organization with the goal of helping people understand the different sides of the debate regarding the use of the term Redskins. NAGA believed that the term was a positive symbol and image for Native Americans and a tribute to Native American culture, and described its mission as "Education not Eradication." (FOF ¶ 17.) Mr. Billeaudeaux has 30 years' experience working with different Native American organizations, including with 100 different tribes, in an attempt to understand the concerns and culture of Native Americans. From that experience, Mr. Billeaudeaux explained Native Americans wanted to be understood and represented, and to sustain their cultures. There are over 600 Native American tribes, with differing cultures,

11

beliefs, histories, and languages. The term "Native American" does not refer to a monolithic or homogenous group, but has become a common way to describe a group of separate nation tribes of indigenous people. The term Redskins can be derogatory, but, citing his research and a dictionary definition, there are tribes that, as a part of the tribes' culture, paint themselves red for various sacred ceremonies, battle, initiation, and burial, and call themselves "red-painted people, redmen[,] and redskins" and promote the use of the term Redskins. (*Id.* ¶¶ 18, 21.)

Mr. Billeaudeaux opined "it would be ok to use the term Redskin as long as the name and symbols are both informed appropriately and accurately." (*Id.* ¶ 27.) In Mr. Billeaudeaux's opinion, "a school should be able to keep the Redskin[s] name and logo so long as the term and logos are given the dignity and respect they deserve[] and are displayed carefully, with cultural sensitivity and in a historically accurate manner." (*Id.* ¶ 28.) As for the specific imagery and logos used by the District, Mr. Billeaudeaux explained the image currently displayed at the High School was a Plains "warrior" image and is a common native themed image. However, this image is historically misaligned, and Mr. Billeaudeaux informed the District and Dr. McGee that it should be changed to ensure historical accuracy. Further, during his tour of the High School, Mr. Billeaudeaux observed a photograph of a student wearing feathers, which Mr. Billeaudeaux indicated should be removed because wearing feathers by someone who did not earn them was comparable to wearing unearned military medals, referred to as "stolen valor." (*Id.* ¶ 32.)

Both Mr. Billeaudeaux and Dr. Staurowsky opined about surveys taken of Native Americans as to whether the professional football team name Redskins was offensive. A 2004 study reported that 9 out of 10 Native American fans of the team

did not find the term offensive, and a 2016 survey found similar results. Dr. Staurowsky questioned the methodology of, and questions posed by, those surveys.

The District presented a number of fact witnesses, including two with some Native American ancestry and a member of the District's School Board, regarding their positive views of the meaning of the word Redskins and who did not find the term or imagery offensive, although some acknowledged that the word was considered by others to be, and was defined, as a racial slur. (FOF ¶ 36a-36g.) Two other members of NAGA, Mark Yancey and Eunice Davidson, testified that many Native Americans think of Redskins as a positive term and not offensive. Mr. Yancey did not condone the wearing of costumes intending to depict Native Americans or the wearing of unearned feathers, which is inappropriate. Ms. Davidson acknowledged that the leader of her own tribe, the Dakota Sioux, did not agree with the use of the term Redskins. (*Id.* ¶ 36i-36j.) Mr. Copeland, the District's superintendent from October 1, 2012, to June 30, 2015, testified that he understood some Native Americans found the word offensive, and that he went back and forth over the issue. After reading some written materials, Mr. Copeland reached the point where he agreed that the District should no longer use Native American imagery and should change the name. (*Id.* ¶ 36h.) Dr. McGee testified regarding his interactions with Ms. Boyle, the events surrounding the Playwickian's editorials, and the revision of Policy 600. He understood that some considered the term a racial slur, but he considered the term a tradition and "a local community cultural vernacular." (R.R. at 828a-29a.) With regard to Ms. Boyle, he stated that Ms. Boyle had informed him that Son had left school one day because a photo of students who had painted themselves red for a high school football game was shown at a school assembly.

13

## II. The Commission's Final Opinion and Order

After the public hearing and submission of post-hearing briefs, the Final Opinion and Order was issued, addressing the issue of whether the District was violating the Act, as well as other legal issues raised by the District related to the Commission's jurisdiction and the timing of the factual claims. The Commission addressed these preliminary issues before resolving the ultimate issues before it.

The District argued that the Commission lacks jurisdiction because Section 5 applies to the District only as an employer and Section 5(i) does not apply to public school districts because a public school district is not a "person" as defined by Section 4(a) of the Act. The Commission rejected this argument, citing *Pennsylvania Human Relations Commission v. Chester School District*, 233 A.2d 290 (Pa. 1967), and *Chestnut Hill College v. Pennsylvania Human Relations Commission*, 158 A.3d 251 (Pa. Cmwlth. 2017), which held that public school districts were public accommodations pursuant to Section 4(*l*) of the Act[4] over which the Commission had jurisdiction. According to the Commission, it was necessary for it to exercise jurisdiction over the District to address the allegations raised in this matter, and reading the Act liberally to effectuate its purpose, which is "to secure the full enjoyment of public accommodations," supported the exercise of jurisdiction.

---

[4] "[P]ublic accommodation" is defined by Section 4(*l*) of the Act as meaning, in relevant part:

> **any accommodation**, . . . which is open to, accepts or solicits the patronage of the general public, **including** but not limited to . . . kindergartens, **primary and secondary schools, high schools**, academies, colleges and universities, extension courses and all educational institutions under the supervision of this Commonwealth, . . . and all Commonwealth facilities and services, including such facilities and services of all political subdivisions thereof, but shall not include any accommodations which are in their nature distinctly private.

43 P.S. § 954(*l*) (emphasis added).

(Final Op. and Order at 26.) Therefore, the Commission concluded that it had jurisdiction over the District because the District is, itself, a public accommodation under Section 4(*l*) of the Act. (*Id.*, Conclusions of Law (COL) ¶¶ 1, 4-5.)

The District next asserted that any claim or fact that occurred prior to April 11, 2015, 180 days before the PHRC filed its initial Complaint on October 8, 2015, was time barred. The Commission disagreed that any fact or claim occurring prior to April 2015 could not be considered because, under the continuing violation doctrine, the use of the term and associated imagery and logos was not an isolated incident but have been consistently used by the District since the 1950s. Accordingly, the Commission held that the factual claims based on the District's ongoing use of the term Redskins and related logos and imagery constitute acts that were continuing in nature. (*Id.* ¶ 6.)

The Commission then turned to the merits of the allegations against the District. It acknowledged that this matter reflects the ongoing debate between those who consider the use of Native American names, imagery, and logos a respectful way to preserve the respect and dignity of Native American culture, and those who were trying to eliminate such use by public schools and universities because they are considered harmful. (Final Op. and Order at 27.) The Commission cited various organizations, including: the NCAI, which represents over 500 Native American tribes, that were in opposition to the use of the term Redskins believing it was "disparaging to a substantial portion of Native Americans" (*id.*); the NCAA's actions in 2005 based on that organization deeming the use of Native American nicknames as being hostile and abusive toward a person's ethnicity, national origin, or race; and the U.S. Commission on Civil Rights' statement on why Native American names, imagery, and logos should not be used and calling for the end of such use as they are

15

offensive and disrespectful.  The Commission noted the U.S. Commission on Civil Rights' "deep concern that inaccurate representations of Native Americans [was] a distorted view of the past and stereotypes Native Americans which encourage biases and prejudice towards a minority group." (*Id.* at 27.)  According to the Commission, efforts to obtain voluntary curtailment or changes through the legal process have not been completely successful, citing the unsuccessful legal efforts to get the Washington Redskins professional football team to change its name under the premise of cancelling the team's trademark because the word was disparaging.[5]

With this background, the Commission first addressed the count in the Complaint alleging that the District's use of the term Redskins violates Section 5(i) by "creating an intimidating, hostile and offensive educational environment on the basis of race/ancestry, Native American." (*Id.* at 30.)  The Commission explained that "[o]ne key factor that must be shown in an alleged harassment claim is that someone was, in fact, harassed." (*Id.*)  The Commission considered Ms. Boyle's testimony regarding Son's reactions to the alleged sources of harassment, to which the District objected as being hearsay.  Noting that the question of Son's experiences could have been resolved by his testifying, the Commission took an adverse inference from Son and two other Native American students not testifying that they had been harmed.  (Final Op. and Order at 32-33, COL ¶ 7.)  The Commission rejected Dr. Staurowsky's testimony that harm to Native American students could be assumed, finding "the term Redskins is associated with both positive and negative connotations" and, therefore, distinguishing it from the "N" word.  (Final Op. and

---

[5] We note that, subsequent to the Commission's Final Opinion and Order, this professional football team stopped using the name Redskins. *See* Les Carpenter, *Washington's NFL Team to Retire Redskins Following Sponsor Pressure and Calls for Change*, WASHINGTON POST (July 13, 2020), https://www.washingtonpost.com/sports/2020/07/13/redskins-change-name-announcement/ (last visited June 4, 2021).

Order at 33-34.) Because "no Native American victim testified leaving only **speculation** on whether Native American students were harmed," and with no assumption of **harm** possible, the Commission determined that the PHRC "failed to present sufficient evidence that a Native American student or students were harmed by the use of the word Redskin[s] and the associated logos and imagery" and dismissed these allegations. (*Id.* at 33-34 (emphasis added).)

The Commission nonetheless found that the "record contains adequate evidence that the term 'Redskin[s]' is offensive to Native Americans and it should not be used as a team nickname for any school in the Commonwealth. . . ." (*Id.* at 34.) The Commission examined the testimony of Ms. Boyle and found that she

> provide[d] compelling evidence that she, as a parent of a Native American student who attended [] [H]igh [S]chool, considered the term 'Redskin[s]' to be offensive, that she repeatedly told the school administrators that the term was offensive, and that she tried her best to protect her children from an environment in which a school full of Non-Native American administrators and students preferred to ignore the negative impact the term 'Redskins' was having on herself and her [S]on, because the non-Native Americans felt a sense of ownership over the term and the accompanying imagery, claiming it was a continuing source of pride to those Non-Native Americans.

(*Id*. at 36.) Therefore,

> [w]hile the absence of [] testimony [from a Native American student] may be legally significant for purposes of this individual case, [the Commission] conclud[ed] that the record contains sufficient testimony to support a finding that the term 'Redskins' **is offensive** and, as a matter of **guidance** from the [Commission], should no longer be allowed to be used in the Commonwealth in a public school setting . . . because the record shows that many Native Americans and many non-Native Americans consider it to be a racist term.

(*Id*. at 37 (emphasis added).)

17

The Commission then turned to the remaining component of the PHRC Complaint: "that the educational environment at the [] High School was in some way harmful to both Native American and non-Native American students." (*Id*.) The Commission first noted the prior ruling on the Motion in Limine, which precluded Dr. Staurowsky from testifying about the impact of the use of the term Redskins and associated imagery and logos on District students, but allowed her to testify about the impact that the name, imagery, and logos "might have in an educational setting on both Native American students and non-Native American students." (*Id.* at 36-37.) It then addressed the District's assertion that Dr. Staurowsky's testimony could not be given any weight because she was not qualified to render any opinions as she lacks the education, training, and experience needed, and merely was a conduit of the opinions of others. The Commission rejected this challenge, noting: (1) the District did not object to Dr. Staurowsky's acceptance as an expert at the hearing; and (2) Dr. Staurowsky had the education, experience, and training necessary for her to be accepted as an expert. (*Id.* at 38.) The Commission held that the record showed that Dr. Staurowsky conducted extensive research, wrote articles relevant to the issues in the matter, and taught courses in discrimination in educational settings, including a course on issues related to Native American mascots. Thus, Dr. Staurowsky's opinion "regarding the impact the name Redskins and associated logos and imagery might have in an educational setting on both Native American students and non-Native American students" was allowed. (*Id.* at 37-38.)

After reiterating "the simple fact that not a single Native American student was called to testify" and finding that numerous High School student witnesses testified that they did not witness any discrimination of Native American students,

the Commission concluded there was "**insufficient evidence** that Native American students experienced educational harm." (*Id.* at 38-39 (emphasis added).) The Commission then examined "whether non-Native American students were harmed in some way," as an independent viable claim notwithstanding that it had dismissed the claims related to harm to Native American students. (*Id*. at 38.) In considering the merits of this question, the Commission observed the District's focus was on the Playwickian's student editors and the negative reactions they experienced, but the Commission held that the educational harm found here focused instead on those students "**who, because of the stereotypical environment, displayed their insensitivities" through those negative reactions**. (*Id.* at 39 (emphasis added).) The Commission explained that there was a "fundamental concept that schools have a fiduciary duty owed [to] [their] students to avoid social harm," and, as recognized by the U.S. Commission on Civil Rights, "schools have [a] responsibility to educate students, not [to] use the school's influence to perpetuate misrepresentations of any culture or people," which can **lead to discrimination**. (*Id.* at 39-40.) Here, the Commission held, the District's use of the name Redskins and related imagery and logos constituted stereotypes that consciously and subconsciously influenced how students act and feel toward Native Americans, and teaches those students, who have little to no contact with Native Americans, that stereotyping minority groups is acceptable. (*Id.* at 39-40.) Therefore, the Commission concluded that "[t]he PHRC ha[d] established that Native American logos and imagery at the . . . High School are harmful to non-Native American students as such **logos and imagery create impermissible stereotypes**." (COL ¶ 10 (emphasis added).)

As support for its conclusions, the Commission cited Mr. Billeaudeaux's testimony that when Native American names, logos, and imagery are used by

19

schools, they should be authentic, accurate, and appropriate, should be done with cultural sensitivity, and should be accompanied with specific education accounting for the diversity of Native Americans. The High School's warrior imagery, however, is not a local tribe, but a Plains warrior, which is misaligned, not regionally specific, and should be changed according to Mr. Billeaudeaux. It further pointed to Mr. Billeaudeaux's testimony that the term Redskins may be offensive in the right context, that it was culturally insensitive to treat Native Americans as a single group, and that it was culturally ignorant not to be able to identify the imagery being used correctly, as was the case here. The Commission also highlighted that the District's allowing students to wear feathers to football games is the type of stereotype that mocks and denigrates sacred symbols, which Mr. Billeaudeaux agreed was akin to stealing valor and mimics a sacred tradition for entertainment. (*Id.* at 41-42.) The Commission also found that there was no meaningful instruction about Native Americans and the school's name and related imagery and logos, which Mr. Billeaudeaux considered a necessity, that would better enable students to avoid the view that it was acceptable to tolerate racism or discrimination. (*Id.* at 42-43.) The Commission reviewed Dr. Staurowsky's criticisms of the District's generic Native American warrior images, which she opined imparted negative stereotypical attitudes and beliefs about Native Americans and their way of life. The Commission found that the High School's students' negative stereotypical attitudes and insensitivities, of which the students were unaware, became apparent through their negative reactions to the Playwickian's student editors' attempts to convey their opinions that the term Redskins was a slur and discriminatory. These negative reactions included a teacher yelling at one of the student editors during class, internet posts aimed at the student editors, and being called derogatory names by fellow

20

students, which resulted in the student editors feeling threatened, bullied, intimidated, and harassed. (FOF ¶¶ 87, 92; R.R. at 757a.) One student editor resigned from the Playwickian and another thought about withdrawing from all activities, did not want to go to school, and had trouble sleeping and concentrating. (R.R. at 726a-27a, 889a.) Based on all of this evidence, the Commission concluded that despite being aware of the numerous stereotypes of Native Americans being displayed at the "[] High School, [the District] failed to provide non-Native American students with the information necessary to prevent the formation of the idea that specifically stereotyping Native Americans is acceptable and, by extension, generally, the idea that stereotyping other minorities is also acceptable." (Final Op. and Order at 45.)

As for whether, under these circumstances, this harm to non-Native American students was a violation of the Act, the Commission recognized that "this aspect of the case is quite novel[,]" observing that "Section 5(i)(1) of the [Act] appears to be limited to instances where advantages and privileges of a public accommodation are denied because of 'his' race or ancestry." (*Id.*) However, because the Act is to be construed liberally to accomplish its purposes, the Commission concluded that the educational harm to the non-Native American students constitutes prohibited discrimination. (*Id.*) In support of its broad interpretation, the Commission provided analogies to retaliation cases, such as *Shellenberger v. Summit Bancorp*, 318 F.3d 183 (3d Cir. 2003), and housing discrimination cases, such as *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), where "testers" are used to reveal disparities, and non-targeted bystanders who are found to have a cause of action based upon the discrimination against minority housing applicants. A similar analogy could be found, the Commission explained, in the employment area, where

21

non-targeted bystanders can challenge the discrimination of targeted minorities. *See Clayton v. White Hall Sch. Dist.*, 875 F.2d 676 (8th Cir. 1989); *Waters v. Heublein, Inc.*, 547 F.2d 466 (9th Cir. 1976). While the bystanders were not the objects of the discrimination, they could be considered, for standing purposes, aggrieved persons and assert a cause of action on that basis. Here, the Commission held, "the District's use of stereotypical logos and imagery of Native Americans impacts everyone" and "[t]he non-Native American student bystanders [were] impacted by the District's discrimination against Native Americans in that the non-Native American students [were] denied a proper educational environment in a public accommodation" because they were, "in effect, taught that stereotyping of another group is acceptable." (Final Op. and Order at 48.) It concluded that the Act "should be broad enough to cover bystander individuals who are injured but were not the target of the acts of discrimination" and, therefore, the District was liable for violating Section 5(i)(1) of the Act. (*Id.* at 49.)

In fashioning the remedy for this violation, the Commission noted its broad equitable powers, as recognized by the Supreme Court, *Murphy v. Pennsylvania Human Relations Commission*, 486 A.2d 388 (Pa. 1985), and its authority to "require[ a] respondent to cease and desist from [the] unlawful discriminatory practice and to take such affirmative action . . . as, in the judgment of the [C]ommission, will effectuate the purposes of th[e A]ct." (Final Op. and Order at 50 (quoting 43 P.S. § 959(f)).) The only limitation on that authority, the Commission explained, was that the remedy could not seek to achieve ends other than those stated in the Act. Further, its remedy should eradicate the unlawful discrimination, make the complainant whole, and discourage future discrimination. Although the PHRC argued that the District should be ordered to no longer use the term Redskins, the

Commission was "mindful that there are various views held about the term . . . , both within Native American tribes and with non-Native Americans." (*Id.* at 51.) Citing Mr. Billeaudeaux's and NAGA's position that the way to address the issue is "Educat[e] not Eradicat[e]," the Commission allowed the continued use of the term Redskins, but directed the District to provide "proper[] educat[ion] about both the negative attributes associated with the term and the positive reasons to retain the term," which would "better equip students to begin to understand that there are differences among Native Americans about the term Redskins and what these differences are." (*Id.* at 51-52.) The Commission explained what it believed this education should cover, based on the evidence presented, and made recommendations on how the District could go about that education process. The stereotypical imagery and logos, and the appropriation of customs or traditions, the Commission explained, posed problems and should not be normalized for the purposes of entertainment, citing Mr. Billeaudeaux's testimony. Therefore, the Commission ordered the District to "cease and desist from the use of any and all logos and imagery in the . . . High School that negatively stereotypes Native Americans." (*Id.* at 57.) The District now petitions this Court for review,[6] raising 14 allegations of error by the Commission.[7]

---

[6] The Court's review of a Commission order "is limited to determining whether constitutional rights have been violated, [whether] an error of law has been committed[,] or whether the Commission's findings of fact are supported by substantial evidence." *Doral II Condo. Ass'n v. Pa. Hum. Rels. Comm'n*, 779 A.2d 605, 607 n.3 (Pa. Cmwlth. 2001).

[7] The arguments have been reorganized and consolidated for ease of discussion. The issues the District raises are: (1) whether the Commission has jurisdiction over the District; (2) whether the statute of limitations barred any claims or the consideration of events that occurred prior to April 11, 2015; (3) whether the Commission erred in holding that the alleged harm to non-Native American students arising from the discrimination of Native American students constituted prohibited discrimination; (4) whether the Commission's evidentiary rulings regarding the testimony of Dr. Staurowsky and Ms. Boyle were erroneous; (5) whether the Commission's **(Footnote continued on next page…)**

23

## III. Discussion

*A. Whether the Commission has Jurisdiction Over the District.*

### 1. The Parties' Arguments

The District argues as follows. The Commission erred in holding that it could exercise jurisdiction over the District under these circumstances. Public schools do not qualify as "persons" for purposes of Section 5(i) and only fall under the Commission's jurisdiction when they act as an employer. Nor do the Commission's regulations at 16 Pa. Code § 47, which apply in education matters, provide jurisdiction, as that would exceed the authority conferred by the legislature. Even if the regulations did not exceed that authority, they only apply to schools "open to . . . the general public" and public schools are not open to the general public, only to school district residents, and the regulations address matters not at issue here. (District's Brief (Br.) at 27.) The cases upon which the Commission relied to find jurisdiction, *Chester School District* and *Chestnut Hill College*, are distinguishable because they did not involve the same Act provisions.

The Commission responds as follows. It properly exercised jurisdiction in this matter because the District is, itself, a public accommodation, and by defining educational institutions under the supervision of the Commonwealth as public accommodations, 43 P.S. § 954(*l*), the legislature intended to confer jurisdiction in the Commission over those institutions. Other statutory language, such as that in

findings regarding the term Redskins and related imagery being offensive and harming non-Native American students were supported by substantial evidence; (6) whether the Commission exceeded its authority in fashioning its remedy; (7) whether the Commission erred in finding that non-Native American students have a retaliation claim against the District; (8) whether the PHRC's investigation was properly conducted; (9) whether the Final Opinion and Order violated the free speech rights of others; (10) whether the Commission erred in finding that the District had a fiduciary duty to its students which it violated; (11) whether the Final Opinion and Order violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, U.S. CONST. amend. XIV; and (12) whether five specific findings of fact were supported by substantial evidence.

Section 2(a) of the Act stating that "the denial of equal . . . public accommodation opportunities because of such discrimination . . . result[s] in racial segregation in public schools," 43 P.S. § 952(a), reflects a legislative intent to confer the Commission with jurisdiction over public schools as public accommodations. Further, *Chestnut Hill College* and *Chester School District* clearly hold that the Commission has jurisdiction over public school districts as public accommodations.

  2.  Analysis

Section 5(i)(1) provides, in relevant part, that it is an unlawful discriminatory practice for "any person being the . . . superintendent, agent or employe of any public accommodation . . . to" "[r]efuse, withhold from, or deny to any person because of his race, . . . [or] ancestry . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such public accommodation . . . ."  43 P.S. § 955(i)(1).  Our Supreme Court, in *Chester School District*, discussed the history of this provision and the Act, which was enacted, in part, in recognition of the evils of both de jure and de facto segregation of public schools – which are public accommodations under Section 4(*l*) of the Act.  233 A.2d at 294-96.  In 1961, the legislature amended and retitled the former Pennsylvania Fair Employment Practice Act[8] as the Act, and expanded the protection from discrimination to include housing and public accommodations.  The Pennsylvania Supreme Court stated in *Chester School District* that, in those amendments, the legislature specifically referred "to the evils resulting from racial segregation in the public schools." *Id.* at 296.  Focusing only on de jure incidents of discrimination "is a vast oversimplification" of the Act, the Supreme Court explained, "and does not adequately reflect the mandate that the statute be liberally interpreted to reflect its purpose," which is that discrimination

_____

[8] Act of October 27, 1955, P.L. 744.

"**in the public schools**, whatever its source, threatens 'the peace, health, safety and general welfare of the Commonwealth and its inhabitants.'" *Id.* at 297 (quoting Section 2(a) of the Act, 43 P.S. § 952(a)) (emphasis added). This is because even "seemingly neutral decisions by school officials" may perpetuate discrimination, and narrowly construing Section 5(i)(1) to exclude only de jure discrimination "would totally deprive the Commission of effectiveness in th[is] area. . . ." *Id.* at 298.

Notwithstanding the Supreme Court's explanation as to the history and stated purpose of the Act, particularly in reference to preventing discrimination in public school districts, the District claims, and the Concurring Opinion agrees, that the Commission lacks jurisdiction because Section 5(i)(1) uses the word "person" and the definition of "person" does not expressly include school districts. The District maintains that it is not a "person" when it acts as an educational institution and, therefore, the Commission lacks jurisdiction to determine whether the District violated the Act. The District asserts that *Chester School District* and *Chestnut Hill College* are distinguishable because neither addressed the argument that a public school district is not a person for purposes of Section 5(i)(1). We are unpersuaded by the District's arguments.

The definition of "person" in Section 4(a) uses the language "includes, but is **not limited to**," which is expansive, not limiting, language. 43 P.S. § 954(a) (emphasis added). In addition, school districts, as recognized by the Supreme Court in *Chester School District*, are, **by definition, public accommodations under Section 4(*l*)**, the privileges and advantages of which cannot be withheld or denied to persons based on protected characteristics. Further, the controversy in *Chester School District*, **as here**, was whether a public school **district violated Section 5(i)** of the Act by engaging in unlawful discriminatory practices based on race. 233 A.2d

26

at 291, 296. The Supreme Court there held that the Commission **had jurisdiction over the school district** because school districts are public accommodations and rejected the school district's argument that finding the Commission had "jurisdiction in this area will result in the usurpation of the [school district's] functions under the Public School Code" of 1949.[9] *Id.* at 298.

Agreeing with the District, the Concurring Opinion's contrary interpretation of "person" would eviscerate the Act. The Concurring Opinion's narrow interpretation focuses on the inclusion or exclusion of school districts in different definitions in the Act to conclude that the legislature did not intend school districts to be subject to the Commission's jurisdiction under these circumstances. Section 4 begins by advising that the words used in the Act are defined by this section "**unless a different meaning clearly appears from the context**." 43 P.S. § 954 (emphasis added). In the context of refusing or denying access to a public accommodation on the basis of a protected class, and mindful that the legislature used the phrase "included, but not limited to," the word "person" must be read more broadly, not narrowly, to include a public accommodation itself. The legislature's expansive language and directive that these terms be considered in their context must be given their full effect so as to further the object of the Act; the narrow reading of the Concurring Opinion does not do so.

Shortly after the Act was amended in 1961, our Supreme Court explained that the legislative intent was to recognize and remedy the "evils" of unlawful discrimination **within public schools**, which **was the issue** in *Chester School District*, 233 A.2d at 296. In contrast, under the Concurring Opinion's reasoning, the Commission would now **lack jurisdiction** to consider complaints of

---

[9] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101—27-2702.

27

discrimination within public schools except when they act as an employer or when the discrimination is the result of individual action by a "'superintendent, or employe[e]' of a school district." *Neshaminy Sch. Dist. v. Pa. Hum. Rels. Comm'n*, __ A.3d __, __ (Pa. Cmwlth., No. 1765 C.D. 2019, filed June 7, 2021) (Brobson, J., concurring), slip op. at 5. Such reasoning, however, leaves claims of **systemic unlawful discrimination**, like those at issue in *Chester School District*, that result from an **action or policy of a school district**, beyond the protections of the Act. The Supreme Court did not insulate the school district in *Chester School District* from liability for its systemic unlawful discrimination. The Concurring Opinion's unnecessarily narrow interpretation is contrary to one of the very purposes of the Act as stated by our Supreme Court. The legislature has shown no disagreement with the Supreme Court's application of Section 5(i) to public schools in *Chester School District*.

Given this precedent, the word "person" in Section 5(i)(1) and the definition of "person" in Section 4(a) should continue to be read *in pari materia*, **not** as **limiting** the Commission's jurisdiction, but, rather, describing **whose** actions (superintendent, agent or employe) may be imputed to the public accommodation for purposes of imposing liability. The inclusion of a school district in the term "employer" does not indicate a lack of jurisdiction over school districts when they are accused of unlawful discrimination in providing a public accommodation, but a recognition that school districts **are also employers** and cannot engage in unlawful discriminatory practices against their employees. Such discrimination would **not** fall under Section 5(i)(1) of the Act, but within other subsections of Section 5. Likewise, the exclusion of schools or school districts from the definition of political subdivision does not reflect an intent to limit the Commission's jurisdiction, but is

instead a recognition that schools are **already covered** by the Act's terms through their inclusion in the definition of both public accommodation **and** employer. For these reasons, we conclude that the Commission's finding that it had jurisdiction is consistent with the Act and precedent.

### B. Whether the Statute of Limitations Barred any Claims or Consideration of Facts Based on Events that Occurred Prior to April 11, 2015.

#### 1. The Parties' Arguments

The District argues that the Commission erred in hearing claims that fell outside the 180-day statute of limitations, which commenced on April 11, 2015, and, therefore, the claims and facts based on the use of the term Redskins and related imagery and events occurring prior to that date should not have been considered. Because the PHRC had knowledge of these events prior to October 2015, when it filed the initial Complaint, the District contends the PHRC was not diligent in bringing the claims and it was not reasonable for the PHRC to wait to bring those claims. Thus, per the District, the continuing violation doctrine does not apply.

The Commission responds that the claims are not time barred because the continuing violation doctrine applies, noting that the PHRC filed the initial Complaint in October 2015 within days of the withdrawal of the Boyle complaint. The District's longtime use of the term Redskins and related imagery is a continued practice since at least the 1950s, and into the 180-day period, justifying the application of the continuing violation doctrine, according to the Commission.

#### 2. Analysis

Section 9(h) of the Act requires that "[a]ny complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination . . . ." 43 P.S. § 959(h). Statutes of limitations are intended to keep stale claims out of courts. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380

(1982). However, a complainant can pursue a claim under the Act for conduct occurring outside this 180-day period if the conduct is part of an **ongoing** pattern or practice. *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481 (3d Cir. 1997), *abrogated on other grounds*, *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013). This is because "[w]here the challenged violation is a continuing one, the staleness concern disappears." *Havens Realty Corp.*, 455 U.S. at 380. Where a complainant "challenges not just one incident of conduct . . . , but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." *Id.* at 381. Here, there is no dispute that the complained of conduct continued into the 180-day period or that the use of the term Redskins and related imagery and logos was a practice that had been ongoing since at least the 1950s. Thus, there was no error in the Commission applying the continuing violation doctrine.

Further, the District's contentions that there was a lack of diligence and that it was unreasonable to have waited until October 2015 to file the initial Complaint are not persuasive. Prior to October 2015, the matter was proceeding based on the Boyle complaint, and it was not unreasonable to allow that complaint to challenge the District's actions, rather than the PHRC filing a complaint of its own. Accordingly, these are not reasons for reversing.

   *C. Whether the Commission Erred in Finding that the Harm to Non-Native American Students Could Constitute Unlawful Discrimination Under the Act After it Found that the Evidence Could Not Support Claims of Discrimination Against Native American Students.*

   1. The Parties' Arguments

   The District argues as follows. The Commission erred in concluding that non-Native American students have "bystander" claims based on the alleged

30

discrimination against Native American students through the District's use of the term Redskins and related imagery and logos. The Act has no language that supports a bystander claim, and there are no cases interpreting the Act to confer such a claim. Section 5(i)(1) recognizes discrimination claims made only by "a 'person' who experiences discrimination not a larger group who do not." (District's Br. at 31.) The liberal construction language of the Act does not allow for claims that are "not remotely addressed in the Act." (*Id.* at 32.) Citing cases in which limitations on the Act were recognized, the District argues that the Commission lacks the authority to recognize claims, remedies, or powers not expressly provided by the Act. Moreover, the Commission erred in relying upon federal civil rights law and cases interpreting those laws to find a bystander claim for non-targeted persons because the language of those federal laws is different from the Act's language which limits claims. Finally, there was no evidence that Native American students from the District were actually harmed as a result of the District's continued use of the term Redskins and related imagery and logos, which the Commission acknowledged in its Final Opinion and Order. "Non-Native American students cannot have a claim for discrimination against Native American students" in the absence of evidence that the Native American students were harmed. (*Id.*) Therefore, no viable bystander claim can exist under these facts.

The Commission responds as follows. It properly held that a discrimination claim could be based on non-Native American students suffering harm "because of **discrimination** against Native American students." (Commission's Br. at 21 (emphasis added).) This conclusion is supported by the Act's language, citing Section 5(i)(1), which uses "**directly or indirectly**," and Section 9(a) that allows "**any** person claiming to be **aggrieved** by an alleged unlawful discriminatory

31

practice" to "make, sign and file with the Commission a verified complaint," 43 P.S. §§ 955(i)(1), 959(a) (emphasis added). The Commission's finding that the District was liable for violating Section 5(i)(1) was based on the harm to non-Native American students through the District's perpetuation of racial stereotypes of Native Americans within the High School. This finding is supported by substantial evidence, the Act's language, and federal court decisions interpreting federal anti-discrimination laws, which similarly recognized bystander claims. Finally, contrary to the District's argument, the language of the federal laws and the Act regarding who may file a complaint is similar, as these laws recognize that persons who are "aggrieved" by a discriminatory practice may file complaints.

2. Analysis

Our review focuses on the claims asserted, the Commission's resolution of those claims, and the Commission's findings in support thereof. There were two counts in the Complaint. With regard to the claim of harassment of Native American students, the Commission found that there was no testimony by a Native American student, "leaving **only speculation on whether Native American students were harmed**," and the Commission did not accept the "idea that harm [could] be assumed." (Final Op. and Order at 33-34 (emphasis added).) With regard to the count based on the denial of educational opportunities to Native American students and non-Native American students, the Commission similarly found, based on "the simple fact[s] that not a single Native American student was called to testify" and numerous High School student witnesses testified that they did not witness any discrimination of Native American students, that there was "**insufficient evidence that Native American students experienced educational harm**." (*Id.* at 38-39 (emphasis added).) The Commission thus **dismissed both claims of harm** to Native

32

American students as a result of the District's actions. There has been **no appeal** of those findings and, therefore, for purposes of this appeal, we must accept these conclusions of the Commission. We express no independent opinion as to whether Native American students were harmed by the use of the term Redskins and related imagery and logos as this determination of the Commission has not been appealed to this Court.

Although the Commission dismissed those claims, it found that "[t]he non-Native American student bystanders [were] impacted **by the District's discrimination against Native Americans** . . . ." (*Id.* at 48 (emphasis added).) Specifically, the Commission found that using the name Redskins and related logos and imagery, which are stereotypes, without providing students the necessary educational tools, resulted in educational harm by allowing the students to conclude that it was acceptable to discriminate against Native Americans or other minorities. (*Id.* at 41-44.) Therefore, we must determine whether, when the allegations of harm to Native American students on the basis of race/ancestry are **dismissed** by the Commission, the Commission could nonetheless find an **unlawful discriminatory practice in violation of Section 5(i)(1)** of the Act on the basis that non-Native American students suffered educational harm through the District's actions.

An "**unlawful discriminatory practice**" is defined in Section 5(i)(1) as follows:

> It shall be an unlawful discriminatory practice . . . :
>
> For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any public accommodation, resort or amusement to:
>
> > (1) Refuse, withhold from, or deny to **any person because of <u>his</u> race**, color, sex, religious creed, **ancestry**, national origin . . .

33

**either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such public accommodation**, resort or amusement.

43 P.S. § 955(i)(1) (emphasis added). This plain language links the cause of a deprivation of public accommodation to **that person's** race, ancestry, or some other identified characteristic under the Act. The touchstone of interpreting statutory language is to ascertain and effectuate the intent of the legislature, and "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Section 1921(a), (b) of the Statutory Construction Act of 1972 (SCA), 1 Pa.C.S. § 1921(a), (b). Applied here, the clear and plain language of Section 5(i)(1) requires a finding that the District deprived Native American students of a public accommodation, based on the Native American students' race or ancestry, in order for there to be an unlawful discriminatory practice. The Commission recognized this in its Final Opinion and Order, stating that "Section 5(i)(1) of the [Act] appears to be limited to instances where advantages and privileges of a public accommodation are denied because of 'his' race or ancestry." (Final Op. and Order at 45.)

Section 5(i)(1) is definitional; it does not address who might be aggrieved by, nor who might suffer harm from, an unlawful discriminatory practice. Those individuals are addressed in Section 9(a) of the Law, which authorizes

> **[a]ny person claiming to be aggrieved by an alleged unlawful discriminatory practice** may make, sign and file with the Commission a verified complaint, in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission.

34

43 P.S. § 959(a) (emphasis added).  While this section describes who is "aggrieved" and thus has standing to bring a claim, in order for a complaint to ultimately be successful, there must be a determination that an unlawful discriminatory practice as defined by Section 5(i)(1) existed.  Without an unlawful discriminatory practice, there can be no practice upon which "any person" can "claim[] to be aggrieved by." 43 P.S. § 959(a).  The Commission seemingly recognized that discrimination against Native Americans is a necessary predicate, stating the non-Native Americans were harmed "**by the District's discrimination against Native Americans**. . . ."  (Final Op. and Order at 48 (emphasis added).)    However, the Commission found insufficient evidence that Native American students were harmed and **dismissed** the counts alleging harassment and the denial of educational opportunity to Native American students.  It is for this reason that the Commission's reliance on Section 9(a) is unsuccessful.

Section 12(a) of the Act also does not aid the Commission's argument. Section 12(a) states that the Act's provisions "shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply."  43 P.S. § 962(a).  Although the Act is to be liberally construed, the principle of liberal construction "does not justify interpreting a statute in a manner that is contrary to the plain and ordinary meaning of the statute's text." *Johnson v. Phelan Hallinan & Schmieg, LLP*, 235 A.3d 1092, 1100 (Pa. 2020).  The text of a statute "cannot be ignored in pursuit of its spirit even though a broad or liberal construction would obviously protect society . . . ." *Commonwealth v. Clanton*, 151 A.2d 88, 92 (Pa. 1959).  While the Commission's desire to extend the protections of Section 5(i)(1) is understandable, such extension must be authorized by the plain language of the statute. *See Pa. Hum. Rels. Comm'n*

35

*v. Zamantakis*, 387 A.2d 70, 72 (Pa. 1978) (holding that the Commission has no authority beyond the powers conferred to it under the Act). Here, the Commission found unlawful discrimination based on harm to non-Native American students, despite dismissing the claims as to Native American students. However, this exceeded what is allowed by Section 5(i)(1)'s plain language and cannot be upheld. Where the Commission's interpretation is not consistent with the plain language of the Act, that interpretation carries little weight. *See Off. of Admin. v. Pa. Lab. Rels. Bd.*, 916 A.2d 541, 550 n.11 (Pa. 2007) (reviewing the Pennsylvania Labor Relations Board's interpretation of the Public Employe Relations Act[10]). Any extension of Section 5(i)(1) must be made by the legislature, not the Commission or the courts.

The federal cases cited by the Commission are similarly inapplicable based on the Commission's findings. The Commission concluded that *Trafficante* and the other federal cases involving housing and employment discrimination require that "[c]ivil rights statutes . . . be construed liberally to support a broad prohibition against discrimination, **regardless of who is the direct target of the acts of discrimination**" because "discriminatory conduct can reach groups of people and not simply the individual who is the **target of the animus**."[11] (Final Op. and Order at 49 (emphasis added).) Nonetheless, there still must be a target of the acts of discrimination. It does not mean that those who are not the objects of the discrimination can bring legal action under the Act when the claim of discrimination against a targeted individual or group has been dismissed. Instead, the federal cases

---

[10] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101—1101.2301.

[11] Pennsylvania courts are not to read the Act in a vacuum but are to interpret it in accordance with federal anti-discrimination laws except where there is a specific difference within the Act's language that warrants different treatment. *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005); *see also Phila. Hous. Auth. v. Am. Fed. of State, Cnty. & Mun. Emps.*, 956 A.2d 477, 484 n.12 (Pa. Cmwlth. 2008) (explaining that Pennsylvania courts look to federal court decisions interpreting the Act's federal counterparts).

upon which the Commission relies involved claims that, although brought by those who were **not the objects** of discrimination, alleged the suffering of injuries as a result of **the discrimination against protected individuals or groups**.

In *Trafficante*, tenants of an apartment complex filed legal actions, alleging that the complex's owner **discriminated against non-white applicants** on the basis of race and that the tenants were injured by this discrimination because, among other reasons, "they had lost the social benefits of living in an integrated community." 409 U.S. at 207-08. These actions were dismissed on the basis that the tenant bystanders were not entitled to sue under Section 810(a) of Civil Rights Act of 1968, 42 U.S.C. § 3610(a), which the district court narrowly construed to "permit complaints only by persons who are the objects of discriminatory housing practices." *Trafficante*, 409 U.S. at 208. The U.S. Supreme Court reversed and remanded, reasoning that the language used in that section, "[a]ny person who claim[ed] to have **been injured by a discriminatory housing practice**" should be broadly construed to give standing not only to the objects of the discrimination, the minority housing applicants, but also to those who are injured **by that discrimination**, the tenant bystanders. *Id.* at 207, 212 (emphasis added).[12] Similarly, in *Waters*, an employee filed an action against her employer alleging that the **employer discriminated against her African-American and Spanish-surnamed co-workers** and sought to enjoin the employer from discriminating against those groups, to whom the bystander did not belong. 547 F.2d at 467-69. After dismissal based on her lack of standing, the U.S.

---

[12] In *Trafficante*, the Court explained that "complaints by private persons are the primary method of obtaining compliance with" anti-discrimination laws, and, citing language from Section 2000e-5(a) of the Civil Rights Act of 1968, 42 U.S.C. § 2000e-5(a), that "allowed a suit to be started 'by a person claiming to be aggrieved,'" "concluded that the words used showed 'a congressional **intention to define standing as broadly as is permitted**. . . .'" *Trafficante*, 409 U.S. at 209 (emphasis added) (internal citations omitted).

Ninth Circuit Court of Appeals reversed and remanded, explaining that the matter was "logically indistinguishable from *Trafficante*" and the bystander could continue to bring her claims. *Id.* at 469.[13] These cases found bystander standing based on colorable claims of discrimination against protected individuals or groups, allowing the litigation to proceed. However, they did not, as the Commission did here, find discrimination based on the bystanders' harm after **dismissing as unsubstantiated** the claims of discrimination against protected individuals or groups.

In *Clayton*, an employee filed a complaint based on harm that she suffered as a result of her employer's racial discrimination against an African-American co-worker.[14] 875 F.2d at 678-79. In that case, the employer school district had allowed the employee to enroll her child in the school where she was employed, notwithstanding that she no longer resided in the school district. *Id.* at 678. When an African-American co-worker who did not reside in the school district attempted

---

[13] The complaint in *Waters* involved Title VII of the Civil Rights Act of 1968, but the Ninth Circuit Court of Appeals applied *Trafficante*, 409 U.S. at 209-10, which was a Title VIII case, 42 U.S.C. § 2000e-5(f)(1). The U.S. Supreme Court has recently indicated that the aggrievement necessary to file a claim under Title VIII and Title VII is not coextensive and that Title VII aggrievement relates to whether the plaintiff falls within the "zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for [the plaintiff's] complaint." *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176-77 (2011) (internal quotation marks and citation omitted). Thus, the U.S. Supreme Court held that the plaintiff in *Thompson*, who was fired after his co-worker and fiancée had filed a complaint for sex discrimination, had standing to file a retaliation claim because he fell within the zone of interests sought to be protected by Title VII, the intent of which was to protect employees from unlawful discriminatory practices and included those, like this plaintiff, who would be "collateral damage" of an employer's unlawful act. *Id.* at 177-78.

[14] The complaint in *Clayton* was dismissed due to the bystander not having standing to assert the discrimination claims, and the Eight Circuit reversed, finding that she sufficiently alleged an injury in fact, a hostile work environment, and the injury was an interest arguably within the zone of interests to be protected or regulated by Title VII, which is to be liberally construed. 875 F.2d at 679-80 (citing, e.g., *Trafficante*'s statement that persons aggrieved included those who were not the objects of discrimination but were injured by the benefit of interracial association).

to do the same for his child, the employer refused to do so on the basis that it was against the school district's policy, which had previously not been enforced. *Id.* Thereafter, the employee was informed that her child could no longer attend the school in the school district. *Id.* The employee filed an employment discrimination action against the employer, claiming this event created a racially discriminatory work environment, i.e., the discrimination toward her co-worker, by which she was harmed. Although the employee was found to have standing, **her discrimination claim was dismissed because she could not prove discrimination** as a matter of law having "relie[d] upon a single incident of alleged discrimination" against her co-worker. *Id.* at 680. Therefore, even though the employee could bring her claim based on her alleged harm, she still had to prove the **underlying discrimination** against the protected individual to be successful.

Thus, in the federal cases cited by the Commission, the bystander claims were predicated on an allegation that individuals in the protected classes had been harmed or discriminated against, which discrimination had also personally harmed the bystander. None of the cases cited by the Commission to support its deviation from Section 5(i)(1)'s language found that a bystander claim could be successfully asserted in the absence of a finding of discrimination toward the targeted individual or group. Rather, those cases treated the claims of discrimination against a targeted individual or group as an element that the bystander had to prove in order for the claim to proceed. As demonstrated by *Clayton*, a bystander claim will fail if the asserted incident of discrimination against a protected person or group that caused harm to the bystander is insufficient to state a cognizable claim. Accordingly, *Trafficante* and the other federal cases cited by the Commission do not support its

conclusion that the harm suffered by the bystander is, in the absence of harm to the individual within the protected class, itself, a discriminatory practice.

Instead, we find that the case *sub judice* is more like *Erdman v. Nationwide Insurance Company*, 510 F. Supp. 2d 363, 367-68 (M.D. Pa. 2007), where the employee's claim under the Act was not based on unlawful discrimination by her employer against an individual that was a member of a protected group identified under Section 5(i)(1) of the Act, but on alleged discrimination directly against the employee due to her association with her child who was disabled. The U.S. District Court for the Middle District of Pennsylvania found that there was no direct associational discrimination claim explicitly available to the individual employee under the Act's terms. *Erdman*, 510 F. Supp. 2d at 374-75. Here, the Commission found discrimination based not on harm to a member of a protected group under Section 5(i)(1), but solely on the harm to the non-Native American students. This is sufficiently similar to the associational claim rejected in *Erdman* that we are persuaded by the federal court's determination in that case.

The Commission also argues its more expansive reading of Section 5(i)(1) is supported by Section 12(a) of the Act because that section has been cited to expand the scope of other provisions of the Act, particularly Section 5(d),[15] which addresses retaliation. The Commission argues that although the plain language of Section 5(d) "does not specifically protect those who request an accommodation from acts of retaliation," such claims have been recognized, using Section 12(a), as violations of

---

[15] Section 5(d) prohibits "discriminat[ion] in any manner against any individual because such individual has opposed any practice forbidden by this [A]ct, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this [A]ct." 43 P.S. § 955(d).

the Act based on the general principles announced in *Shellenberger*. (Final Op. and Order at 47.) We disagree that these principles apply here.

In *Shellenberger*, the Third Circuit read the Americans with Disabilities Act of 1990[16] (ADA) to allow a claim for retaliatory discharge based on the plaintiff requesting accommodation even though the retaliation provision did not expressly include such requests as a basis for a retaliation claim.[17] *Shellenberger*, 318 F.3d at 188. However, there are no allegations that the non-Native American students were engaged in protected activity and were retaliated against; thus, this case offers little guidance in resolving the present issue. Further, the issue of whether the Commission can find discrimination **beyond that which the legislature intended to be discrimination** is different from merely ensuring that engaging in activity intended to be protected by the legislature is, in fact, protected as was the case in *Shellenberger*. Therefore, we are not persuaded that *Shellenberger* supports the Commission's expansion of Section 5(i)(1) here.

In short, Section 5(i)(1)'s plain language provides that the "unlawful discriminatory practice" required to establish a violation of the Act is linked to the denial of a public accommodation (harm) to the person that is actually the **target** of the discrimination based, *inter alia*, on **that person's** protected characteristic, such as race or ancestry. 43 P.S. § 955(i)(1). The Commission determined that the PHRC did not meet its burden of proving that an unlawful discriminatory practice **as defined by the plain language of Section 5(i)(1)** occurred here. The Commission

---

[16] 42 U.S.C. §§ 12101-12213.

[17] The statutory provision at issue stated: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." *Shellenberger*, 318 F.3d at 188 (citing 42 U.S.C. § 12203(a) (2002)). This section provided protections that are substantially similar to Section 5(d) of the Act.

instead, based on the evidence before it, found that any harm to Native American students by the District's actions was either speculative or not supported by the evidence, and, therefore, could **not** support a finding of unlawful discrimination. Although dismissing the claims of unlawful discrimination against Native Americans, the Commission nonetheless, apparently conflictingly, held that the discrimination of Native American students caused harm to non-Native American students. (Final Op. and Order at 48.) However, the Commission cannot both dismiss claims as unsubstantiated or speculative and then rely on those claims to find harm to others. We emphasize that these findings were not challenged, and we are bound by them. Although the Act is to be liberally interpreted, neither the Commission nor this Court can ignore the plain language of Section 5(i)(1) and expand unlawful discriminatory practices beyond those that were defined by the legislature. *Johnson*, 235 A.3d at 1100.[18] In the absence of a finding that the District engaged in unlawful discriminatory practices against Native American students based on those students' race/ancestry, the Commission exceeded its authority when it found that the harm to non-Native American students constituted an unlawful discriminatory practice under Section 5(i)(1).

## IV. Conclusion

There can be no dispute that the Act is intended to be used to eliminate unlawful discriminatory practices, as defined by Section 5(i)(1), within Pennsylvania. The Commission's authority is defined by the Act, and the Act's plain language may not be ignored in an effort, however laudable, to pursue its spirit. Reviewing the Act's plain language, the record, and the Commission's Final Opinion and Order, we agree with the Commission that it had jurisdiction over the

---

[18] Because of our disposition, we do not address the District's remaining issues.

District and that the claims raised were not barred by the statute of limitations. The Commission's holding that the District violated Section 5(i)(1) based on the educational harm caused to non-Native American students was predicated on "[t]he non-Native American student bystanders [being] impacted by **the District's discrimination against Native Americans** . . . ." (Final Op. and Order at 48 (emphasis added).) However, the Commission **dismissed** both claims alleging that the District committed an unlawful discriminatory practice causing harm to Native American students, on the basis that such harm was either speculative or not supported by the evidence. That dismissal was not appealed and is not before us. Because the Commission dismissed the claims of discrimination against Native American students, the predicate under Section 5(i)(1) to sustain the claim for harm to non-Native American students was not there. Therefore, the determination is not supported by the Act's plain language. Accordingly, the Commission's Order is reversed.

 

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Neshaminy School District, : 
                             Petitioner : 
            : 
             v. :   No. 1765 C.D. 2019
            : 
Pennsylvania Human Relations : 
Commission, : 
                Respondent : 

## O R D E R

**NOW**, June 7, 2021, the Order of the Pennsylvania Human Relations Commission, entered in the above-captioned matter, is **REVERSED**.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Neshaminy School District, :
                    Petitioner :
                               :
        v.                     : No. 1765 C.D. 2019
                               : Argued: December 8, 2020
Pennsylvania Human Relations   :
Commission,                    :
                    Respondent :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge


**CONCURRING OPINION**
**BY JUDGE BROBSON**                    **FILED:  June 7, 2021**


A school district is not a "person" and thus the Pennsylvania Human Relations Commission (Commission) lacks jurisdiction to adjudicate a complaint against a school district under Section 5(i)(1) of the Pennsylvania Human Relations Act[1] (Act).  Accordingly, while I agree with the majority's decision to reverse the Commission's Order, concluding that Neshaminy School District (District) violated this section of the Act, I respectfully disagree with its rationale and, therefore, concur.

As the majority notes, Section 5(i)(1) of the Act provides, in relevant part:

It shall be an unlawful discriminatory practice . . .

. . . .

---

[1] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(i)(1).

(i)  For any *person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any public accommodation*, resort or amusement to:

> (1)  Refuse, withhold from, or deny to any person because of his race, color, sex, religious creed, ancestry, national origin or handicap or disability, . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such public accommodation, resort or amusement.

(Emphasis added.)  This section clearly provides for liability of *persons* who discriminate with respect to public accommodations.  The section does not hold the public accommodation itself liable for the discriminatory act of a person.  Accordingly, whether a school district is a public accommodation does not answer the relevant question of whether a school district is also a "person" that can be held liable under Section 5(i)(1) of the Act.

Relevantly, the Act[2] defines several key terms.  The Act defines "person" as follows:

> The term "person" includes one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees in bankruptcy or receivers.  It also includes, but is not limited to, any owner, lessor, assignor, builder, manager, broker, salesman, agent, employe, independent contractor, lending institution and the Commonwealth of Pennsylvania, *and all political subdivisions*, authorities, boards and commissions *thereof*.

Section 4(a) of the Act, 43 P.S. § 954(a) (emphasis added).  Included in this list of potentially liable persons are political subdivisions of the Commonwealth of Pennsylvania.  For statutory construction purposes, the default definition of "political subdivision" expressly includes school districts.[3]  The Act, however,

---

[2] 43 P.S. §§ 951-963.

[3] Section 1991 of the Statutory Construction Act of 1972 defines "political subdivision" as follows:  "Any county, city, borough, incorporated town, township, *school district*, vocational school district and county institution district."  1 Pa. C.S. § 1991 (emphasis added).  The definitions

provides a more narrow definition of the term, which *excludes* school districts, and thus takes primacy over the default definition: "[A]ny county, city, borough, incorporated town or township of this Commonwealth." Section 4(m) of the Act, 43 P.S. § 954(m). Nonetheless, when defining the word "employer" in the Act, the General Assembly chose to include the term "school district" expressly in the definition: "The term 'employer' includes the Commonwealth or any political subdivision or board, department, commission *or school district* thereof . . . ." Section 4(b) of the Act, 43 P.S. § 954(b) (emphasis added).

"The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby*, 842 A.2d 389, 400 (Pa. 2004). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa. C.S. § 1921(c). "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines, Inc. v. Dep't of Env't Prot.*, 676 A.2d 711, 715 (Pa. Cmwlth.), *appeal denied*, 685 A.2d 547 (Pa. 1996). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa. C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa. C.S. § 1922(2). Moreover, where the General Assembly defines words in a statute, those definitions

---

in Section 1991 of the Statutory Construction Act of 1972 apply to any statute, like the Act, "finally enacted on or after September 1, 1937, unless the context clearly indicates otherwise." *Id.*

are binding. *Snyder Bros., Inc. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1056, 1071 (Pa. 2018), *amended on reconsideration*, 203 A.3d 964 (Pa. 2019).

Based on the foregoing, I conclude that the General Assembly consciously and deliberately chose to exclude school districts from the definition of "person" under Section 4(a) of the Act. This is clear because although the General Assembly chose to include within the definition of that term "all political subdivisions," it further chose to define the term "political subdivision" more narrowly for purposes of the Act by *excluding* school districts. It is obvious that this was a conscious decision and not some mere omission or error in draftsmanship. That is evident in the definition of "employer," where the General Assembly expressly included within the definition in the Act both political subdivisions *and school districts.*

While I would agree generally with the majority's proposition that the General Assembly's use of the phrase "includes, but is not limited to" reflects an intent that the list that follows is not exhaustive, the phrase should not be interpreted to sweep within the list those entities—such as a school district—that are excluded from the definition of one of the listed entities—political subdivision. Because the General Assembly chose to include political subdivisions among the list of entities that would qualify as a "person" under Section 4(a) of the Act but purposefully excluded school districts from the definition of political subdivision, it would be contrary to legislative intent for this Court to hold that a school district is among the unlisted entities that fall within the definition of "person." Indeed, given the narrow definition of political subdivision in the Act, if the General Assembly had intended to include school districts in the definition of person, it would have done so

PKB-4

expressly, as it did in the definition of "employer"—*i.e.*, by expressly listing both political subdivision *and* school district.[4]

Again, the issue here is not whether the school district is a public accommodation—it is. The question is whether it is a "person" that can be held liable under Section 5(i)(1) of the Act. For the reasons set forth above, it is not. To be clear, this does not mean that discrimination in our schools is not within the scope of the Act; it simply means that a school district, as an entity, cannot be held liable. Moreover, my analysis of the definition of "person" does not insulate from liability any person who is the "superintendent, agent, or employe[e]" of a school district who engages in unlawful acts of discrimination. *See* Section 5(i)(1) of the Act.

Accordingly, unlike the majority, I would hold that the Commission erred in exercising jurisdiction over a complaint against a school district under Section 5(i)(1) of the Act and reverse the order of the Commission on this basis.

 

P. KEVIN BROBSON, Judge

---

[4] Neither *Pennsylvania Human Relations Commission v. Chester School District*, 233 A.2d 290 (Pa. 1967), nor *Chestnut Hill College v. Pennsylvania Human Relations Commission*, 158 A.3d 251 (Pa. Cmwlth. 2017), addresses specifically the question of whether a school district is a "person" under Section 4(a) of the Act. Accordingly, my analysis is not in conflict with the precedent outlined in those opinions.